STATE OF IOWA, Appellee, v. ARMELIA HOLDER, Appellant.

No. 46753.

**DECEMBER 11, 1945.**

Yeaman & Yeaman, of Sioux City, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, and Edward L. Moran, County Attorney, for appellee.

SMITH, J.—In the early morning of February 6, 1945, defendant shot and killed Helen Madison. Both were colored, as were the four men who were in the immediate vicinity at the time. The homicide occurred on defendant's premises in Sioux City, Iowa. The witnesses, William Moore, George Bruce, and Ben Sanford all roomed there and witness Emanuel Underwood lived in the vicinity.

It is impossible to reconstruct the situation with accuracy of detail but enough may be culled from the testimony to give a general picture. The story begins the evening before when the various persons congregated in defendant's front room, where there were a nickelodeon, a stove, two davenports, and a chair.

Bruce was there from 6 p. m. until midnight; Sanford came about 7, Underwood between 7:30 and 8, Helen at 8 o'clock or a little later, and Moore about 9 o'clock. Sometime during the evening two young neighbor colored girls were present for awhile. Helen was using vile and indecent language but there was no violence or unfriendliness or evidence

of disapproval by anyone. They played the nickelodeon and there was some dancing.

Sanford went to bed about 10 o'clock. Helen and Underwood had a bottle of beer at 11:30 or 12 and she was "pretty drunk then." Bruce left about midnight and returned at 4 or 5 o'clock a. m., about the time Sanford got up preparatory to going to work at 6:30. Helen in the meantime had gone to sleep in the bedroom. Apparently defendant, Moore, and Underwood remained up all night.

About 5 o'clock a. m. Sanford and Bruce had some trivial argument and Helen reappeared on the scene. She was drunk, "kind of groggy." She wanted to play the nickelodeon and dance. Defendant said it was too late, she was closing, "everybody out, she wanted to go to bed." An altercation ensued and the two women got into a scuffle. Helen produced a butcher knife but in the scuffle defendant disarmed her without assistance from the men present. No one seems to have been paying much attention to what was going on; at least no one interfered, except that Underwood at some stage stepped between the women and tried to stop the fight. He says they quieted down for about an hour. There was a time during the scuffle both women were down on the davenport. The evidence indicates this first struggle was not long but was resumed later. Defendant asked someone to call the police but no such call was made. She also asked Helen to leave.

Defendant asked Moore or someone to take Helen out. Finally Moore did open the door at Underwood's request and Underwood took her out and went with her. Helen was again using vile language. Moore testified that when he opened the door she threatened to kill him and pulled something out of her bosom. He did not know what it was, or did not tell if he knew. The defense argues it was a knife but there is no testimony to that effect.

What occurred outside is not too clear. Underwood was trying to restrain Helen from going back into the house and to induce her to go home. As he was taking her out she tried to break the glass in the door with her elbow. Defendant shut the door and locked it behind them. Underwood, fearful of arrest if the "squad car" should appear,

released Helen some distance from the house upon her promise to go home. Instead, she picked up a club, went back on the porch and smashed the glass in the front door.

How long Helen and Underwood were outside before this happened is variously estimated at from six to seven minutes to fifteen or twenty minutes. Nothing particular was happening in the house. Defendant stood by the stove except for one trip into the bedroom shortly before the crash. The State argues she must have procured the gun at that time. When the window glass was smashed she stepped over to the door, drew a revolver and fired one shot through the curtain over the opening. None of the witnesses had before that noticed she had a gun. None noticed where she had had it concealed.

Almost immediately the front door mysteriously came open. Defendant's counsel imply it was pushed open from the outside; the State argues that defendant must have unlocked and opened it. No one clearly explains how it all happened. The women met in the doorway or on the porch just outside and one witness says Helen struck defendant with a club and knocked her to her knees. No other witness so testifies. Underwood, who was outside, says Helen ran into defendant and knocked her off the porch. He says as defendant came out he "hollered 'don't shoot me'" and hid behind a car. Apparently he at once started to leave the scene: "I was going across the street and when I gets across the street I heard a shot and when the third shot [occurred] I was up by the water pump." He also testifies he saw no knife in Helen's possession. "If she had a knife she would hit me, try to make me turn her loose."

All the witnesses agree that two shots were fired while both women were outside the house. Defendant came back into the house, announced she had shot Helen, and proceeded to call the police. No one went out to see whether Helen needed attention or assistance.

Bruce says he was in a hurry to get away and immediately went out the front door. "I just seen an object lying on the ground. I didn't know whether it was her or who."

Sanford stayed in the house ten or fifteen minutes after the shooting and saw the body as he went to work. "I just looked at her, I didn't stop."

The body was lying in the snow outside or partly on the walk, three or four feet from the steps and ten or twelve feet from the door. A knife and an oak chair rocker were lying beside her.

The body showed three bullet wounds. One was in the right shoulder; the other two were in the skull, one along the central forehead at about the hair line and one within the eyebrow on the right side. The doctors say either of these last two would have caused death. The coroner described the shoulder wound and expressed the opinion that Helen Madison, after receiving it, could not have held the club and raised it at all. Dr. Starry, who performed an autopsy, expressed a similar opinion but admitted she could have lifted her left hand very readily.

We have pieced out the story from the fragmentary testimony of the various witnesses. They gave somewhat varying estimates of distances and times, and some told details omitted by others, but there was no fundamental contradiction. Defendant did not testify and the only testimony offered in her behalf was a stipulation to the effect that Helen was under sentence for the crime of conspiracy to commit larceny.

The jury found defendant guilty of murder in the second degree and sentence was pronounced accordingly. Motion to withdraw the charge of second-degree murder and later motions for judgment notwithstanding verdict and for new trial were overruled. The several contentions made on appeal will be noted as we proceed.

I. The case came on for trial, pursuant to assignment, before Judge Browning, judge of the Woodbury district court. The State, by the county attorney, made an application for transfer to another judge of the district, alleging that Judge Browning had admitted prejudice "as far as the law in this case is concerned." Appellant made resistance but the application was sustained and the case was sent over to Judge Forsling, another judge of the district.

Thereupon appellant made application for transfer to

another judge, alleging prejudice against appellant and her attorney on the part of Judge Forsling. The State resisted this and it was denied, the judge disclaiming any acquaintance with appellant, denying ever having heard of the case, and stating that he thought he and appellant's attorney were the best of friends.

These rulings are assigned as errors. The authorities cited in support of the assignment relate to change of venue and not to change from one judge to another in the same venue. They are not very persuasive for that reason. Obviously the prejudice, if any, resulting from an erroneous ruling would be quite different in the two cases.

We do not find any Iowa statute that seems clearly decisive of the contention here. The criminal Code provides that *defendant* may petition for change of place of trial on the ground that he "cannot receive a fair and impartial trial owing to the prejudice of the judge * * * ." Section 13811, Iowa Code, 1939. See, also, section 13810. The *State's* right to petition for such change is limited to the one ground of community excitement or prejudice. Section 13813, Iowa Code, 1939. In any case, "The court, in the exercise of a sound discretion, must, when fully advised, decide the matter of the petition according to the very right of it." Section 13818, Iowa Code, 1939.

We have a general statute disqualifying a judge "in any case wherein he is a party or interested, or where he is related to either party by consanguinity or affinity within the fourth degree, or where he has been attorney for either party in the action or proceeding." Section 10818, Iowa Code, 1939. Our Rules of Civil Procedure permit a transfer to another judge, without a change of venue, where the objection applies only to a judge. Rule 171, superseding section 11417, Iowa Code, 1939.

None of these provisions is applicable here. Appellant did not ask for a change of venue under Code sections 13810 and 13811. Had she done so, it is clear from the statement of Judge Forsling that it should have been denied, in the exercise of a sound discretion, under Code section 13818. By the same token, his denial of her application for change of judge was not erroneous.

Under our statute (section 10797, Code, 1939) the several judges of a district "may together hold the same term, making an apportionment of the business between them * * * ." Judge Browning, under this section, had authority to transfer the cause to another judge of the same district who would accept it, even in the absence of any question by any party of his fitness to try the case. While the State had no *right* to a change of judge, the ruling of Judge Browning was not an abuse of discretion. Furthermore, we are constrained to hold that neither ruling was prejudicial under the record and these assignments must be overruled for that reason also.

II. Was the evidence sufficient to sustain the verdict of second-degree murder? Appellant, at the close of the State's case, moved to withdraw the charge of murder in the first degree. The motion was then overruled but being renewed at the close of all the evidence was sustained. No motion to withdraw the second-degree charge was made until all the evidence was in. It was overruled, as were the several later motions urging the insufficiency of the evidence.

Appellant contends the evidence, as a matter of law, was insufficient to negative self-defense; and that any presumption of malice arising from the use of a deadly weapon was thereby overcome. The two propositions (self-defense and absence of malice) are argued together, probably on the theory that if the circumstances relied on are not sufficient to establish self-defense, they may at least show such provocation as to rebut malice and reduce the offense to manslaughter.

We are confronted by the duty of appraising the record, not for the purpose of passing on appellant's guilt or innocence, but to determine whether it will support the verdict of murder. The abstract propositions of law are well settled; the difficulty is in their application. In this situation precedents, though helpful, cannot be controlling.

Let us consider first the question of self-defense. Appellant cites sections 12921 and 12922, Iowa Code, 1939, which provide in effect that lawful resistance may be made to prevent an offense against one's person and also to prevent an illegal attempt by force to injure property in his lawful pos-

session. Such a plea, in an appropriate case, might be good, even in the absence of statute. The rule is stated to be that:

"Homicide in defense of habitation is justified where the killing is actually or apparently necessary in order to repel a person who attempts to enter in a forcible or violent manner for the apparent purpose of committing a felony therein on either person or property or of inflicting great bodily harm or offering personal violence to a person dwelling or being therein." 40 C. J. S., Homicide, section 109. See, also, 26 Am. Jur., Homicide, section 166.

Our own cases recognize one's right to "repel force by force, in defense of his person, habitation or property * * * ." State v. Thompson, 9 Iowa 188, 192, 74 Am. Dec. 342. See, also, State v. Kennedy, 20 Iowa 569, 571; State v. Metcalfe, 203 Iowa 155, 212 N. W. 382. For the purpose of this case it is not necessary to discuss the points of difference between a plea of self-defense and a plea of defense of habitation or property.

Under the record the jury could have found decedent was the aggressor up to the point when, according to the witness Sanford, she struck appellant with a club after breaking the glass in the door. But there are too many unanswered questions to permit us to say, *as a matter of law,* that appellant shot in defense of either her person or her home.

We have said the record is without material contradictions in the testimony. But the inferences to be drawn differ widely. These inferences were for the jury. Was appellant outside the house for the purpose of defense? The almost uncontradicted evidence is that when Helen and Underwood went out she locked the door behind them. There is no evidence that the lock was broken. After the glass was smashed and the first shot fired did appellant unlock the door or was it broken open from the outside? What occurred after appellant went outside and after she was struck by the club?

There is no evidence that appellant was fearful of her own personal safety, no conclusive evidence as to where the two women were when the two later shots were fired into decedent's forehead, or what was the occasion for firing them.

The evidence indicates Helen was already rendered partially helpless by the first shot.

Appellant, in the earlier fight, had taken the butcher knife away from decedent without any assistance asked or received from the four men standing by and without any apparent fear of personal injury. The uncontradicted evidence is that Helen was drunk and ''groggy'' before she left the house. When the door glass was broken appellant could have called the police as easily as after she went outside and shot decedent.

We have pointed out that there is no testimony as to when appellant procured the revolver or as to her purpose in having it in her possession. Her prompt use of it when the door glass was broken, in view of her demonstrated ability, unarmed, to defend herself against the earlier knife attack, and her unexplained trip to the bedroom just before, might be considered by the jury in considering her plea of self-defense. One witness, Sanford, heard voices outside and the jury might infer appellant, too, heard them before the glass was broken and before she procured the gun. Helen was no stranger but had been at appellant's home ''quite a few times'' and on some of these occasions was drunk. There is no evidence as to her character or reputation as being quarrelsome or hot-tempered; she is described as ''a very small woman.''

These were matters proper to be considered by the jury upon appellant's plea of self-defense: her admitted killing of Helen Madison with a deadly weapon and her failure to testify in her own defense, particularly as to matters peculiarly within her own exclusive knowledge. There was undoubtedly a jury question presented and the trial court correctly so held.

III. What we have said on the subject of self-defense is equally pertinent on the claimed lack of evidence of malice aforethought. Appellant's argument concedes that a presumption or inference of such malice may arise from the use of a deadly weapon. Such is undoubtedly the law. State v. Burris, 198 Iowa 1156, 1159, 198 N. W. 82, and cases cited therein; State v. Gillick, 7 (Clarke) Iowa 287, 310; 26 Am. Jur.,

Homicide, section 308; 40 C. J. S., Homicide, section 25. It is true, as appellant claims, that this presumption may be rebutted by the facts. State v. Borwick, 193 Iowa 639, 643, 187 N. W. 460; State v. Decklotts, 19 Iowa 447, 449.

But we cannot hold, *as a matter of law,* that this record shows such facts. We cannot say there was such provocation as to require us to hold that appellant acted under a sudden transport of passion, reducing the offense to manslaughter. We have held an instruction proper that told the jury if the homicide was effected with a deadly weapon "the provocation must be great, indeed, to lower the offense from murder to manslaughter." State v. Hockett, 70 Iowa 442, 453, 30 N. W. 742, 748. Especially is this true if it appears the defendant armed himself for the encounter. State v. Watkins, 147 Iowa 566, 568 et seq., 126 N. W. 691.

The cases cited by appellant are not sufficiently similar in their facts to serve as precedents here. No complaint is made of the form of the instructions. On the entire record it must be held that the verdict of the jury has substantial support.

IV. Appellant complains of alleged misconduct of the county attorney in the examination of State's witnesses Moore and Bruce. No contention is made in that connection that any improper evidence was admitted. We have studied the record with care and have concluded no reversible error appears. Much of the conduct complained of grew out of the county attorney's claim that the testimony of the witnesses varied in some respects from what they had testified to on the preliminary examination and before the grand jury.

No good purpose would be served by setting out the record. The trial court carefully prevented any impeachment by the attorney of his own witness, while preserving to him the privilege of using the transcript of former testimony to refresh the witness' memory.

This court has held that a prosecuting attorney may inquire of his own witness if he has not, on a former occasion, testified to facts in conflict with testimony just given, and call the witness' attention to the former testimony for the purpose of refreshing his recollection. State v. Cummins, 76

82

Iowa 133, 135, 40 N. W. 124. See 70 C. J., Witnesses, section 745. The right to do this is undoubted in the case of a clearly hostile witness. State v. Walker, 133 Iowa 489, 494, 495, 110 N. W. 925.

The witnesses in the instant case were probably not hostile. As the trial court says, they "apparently were friends of both the defendant and Helen Madison." They were doubtless difficult to examine, due possibly in part to reluctance to testify and in part to lack of education. The variance in their testimony concerned estimates of distances and time, in which great accuracy could not be expected.

We think the county attorney did somewhat overstep the bounds of legitimate direct examination but no error in the admission of any testimony is claimed and we think no prejudice resulted.

■ V. Closely linked with the claim of misconduct referred to in the preceding division is a further claim of misconduct in argument to the jury. The nature of this contention may be best understood by a brief quotation from appellant's printed argument:

"Instead of letting us use those witnesses he [the county attorney] used them. He knew if we used them he could not impeach them. He used them himself knowing what they would swear to and then attempted to impeach them and then tell the jury as he did that he was surprised at what they said and intimated to the jury that they had been fixed * * * ."

It is true the county attorney did assert that the witnesses were reluctant witnesses for the State and favorable to the appellant; and he dwelt upon the discrepancies between their testimony on the trial and what they had previously said; also on their readiness to answer on cross-examination and relate facts not formerly elicited. But there is no suggestion in any of his argument that the witnesses had been "fixed."

We find no such objection urged in the record at the time of argument, nor is it presented in the motion for judgment notwithstanding verdict or in the motion for new trial. Appellant did repeatedly object to the county attorney's

references to appellant's failure to testify. Since the repeal of former section 13891, Iowa Code, 1927, in 1929 [Acts Forty-third General Assembly, chapter 269], there has been no statutory ban on such references. We have in various decisions since then upheld the right to comment and have said the jury might infer guilt from defendant's failure to testify. State v. Graff, 228 Iowa 159, 173, 290 N. W. 97.

There were some other objections made at the time of argument but they are not seriously urged on appeal and we find no reversible error. The presiding judge was in a position to appraise the situation throughout the trial and in overruling the motions he expressed the opinion that "nothing in the record disclosed untoward action which might have incited prejudice."

█ VI. At the close of the argument to the jury and before the instructions were read, counsel for appellant made the objection that the court had failed to furnish preliminary draft thereof to the attorneys prior to argument. He based this objection upon Rule 196 of the Iowa Rules of Civil Procedure.

After trial and within the time allowed by the court appellant filed "Exceptions to Instructions." No complaint was therein urged other than to the sufficiency of the evidence to warrant the submission of second-degree murder. We have already passed on that question.

Section 13845, Code of 1939, provides that, "All the provisions relating to mode and manner of the trial of civil actions" shall apply "to the trial of criminal actions." Section 13876, Code of 1939, provides that, "The rules relating to the instruction of juries in civil cases shall be applicable to the trial of criminal prosecutions." The rule for instructing juries in civil cases provides that, "the Court shall submit to counsel its instructions in their final form, noting this fact of record, and granting reasonable time for counsel to make objections after argument to the jury and before the instructions are read to the jury." Rule 196, Iowa Rules of Civil Procedure. The foregoing statutes and Rule make it the duty of the trial court to submit the instructions to counsel in a criminal case in accordance with Rule 196. This does not

mean that the defendant in a criminal case must make objections to the instructions in the manner and within the time provided by Rule 196.

Section 13944, which is not affected by Iowa Rules of Civil Procedure, provides that the defendant's application for new trial, which can be filed after verdict and before judgment, may contain grounds that "the court has misdirected the jury in a material matter of law" and that "the court has refused properly to instruct the jury."

Since the appellant in her motion for new trial did not assert any error in the court's instructions except, as above noted, relative to the sufficiency of the evidence, we conclude the instructions given correctly stated the law. While the instructions should have been submitted to counsel in accordance with Rule 196, we are of the opinion that under the record here no prejudicial error resulted in the court's failure to so submit them to counsel.

In our references to the record we have consulted not only the printed record and appellee's denial thereof and amendments thereto but also the transcript of the proceedings and the exhibits. We find no reason to hold that appellant did not receive a fair trial. The judgment is affirmed.—Affirmed.

All JUSTICES concur.