STATE OF IOWA, appellee, v. THOMAS ZBORNIK, appellant.

No. 49080.

(Reported in 80 N.W.2d 735)

Boyd G. Hayes, of Charles City, and B. C. Sullivan, of Rockford, for appellant.

Dayton Countryman, Attorney General, Dudley C. Lowry, Assistant Attorney General, and Jack W. Frye, County Attorney, for appellee.

THOMPSON, J.—About 2:30 a.m. on February 5, 1956, the defendant was arrested while driving his automobile upon the streets of Charles City. The arrest was made by police officers John Gordon, James Johnson and Ralph Milhan. The defendant was taken to the police station. While on the way and at the station, the arresting officers testify that he used obscene and indecent language and made threats. The testimony is this: "Mr. Zbornik said that we should call Mike. Mike is the mayor. [Mayor Michael Micich.] Mr. Zbornik said if he hadn't been stopped he would have gone home and got his shotgun and we would not have got him. He said this at the time I first approached the car. He also asked me to take him home. He stated he wanted to know if we wanted a better job and I told him we had one and he said he would have that in the morning." The officers testified that Zbornik was intoxicated at the time.

The grand jury having returned an indictment for the offense of operating a motor vehicle while intoxicated upon the public highway, the case came on for trial on June 5, 1956. A verdict of guilty as charged was returned on June 7. Upon this appeal no question was raised as to the sufficiency of the evidence to require submission to the jury, and we shall not discuss it. The defendant's complaints as shown by his assigned errors are first, that his counsel were not shown the court's instructions prior to their arguments to the jury, second, that the court erred in overruling the defendant's motion for a new trial and exceptions to instructions, "particularly defendant's exception to Instruction No. 10", and third, that the court erred in giving Instruction No. 10 "as there was no sufficient competent evidence in the record to warrant or substantiate the giving of this Instruction No. 10."

I.   We shall first consider the assigned errors Nos. 2 and 3. The defendant says that "these are so similar in substance they are argued together in the interest of brevity and convenience." We understand this to mean that the only question raised by either assigned error No. 2 or No. 3 is the correctness and appropriateness of Instruction No. 10. In fact, this is the only point argued in connection with these two assigned errors, and is the major proposition relied upon for reversal. We set out Instruction No. 10 herewith:

"Certain evidence has been received as to alleged statements made by the defendant to two of the officers on or about May 26th and June 3rd, 1956, also defendant's admission of having offered money to the police 'kitty'.

"You are instructed that this evidence was received solely for the bearing, if any, which it might have upon the honesty or righteousness of the defendant's claim of innocence. The theory being that if one accused of a crime attempts to influence the testimony of persons whom he knows are likely to be witnesses against him, the jury has the right to consider such attempt as an admission that the cause of the party attempting to influence testimony of such witnesses is unjust and that his claim of innocence is without foundation.

"Before, however, you give any consideration to the alleged statements made by the defendant to these witnesses or the defendant's admitted offer of money to the police 'kitty' you must first find that such statements or offer of money were made for the purpose of influencing the testimony of these witnesses and if you fail to so find, then you should give such statements and offer of money no consideration whatsoever.

"If, however, you do find that such statements or offer of money were made for the purpose of influencing the testimony of these witnesses or the prosecution of this case, then you should give the same such weight as you find it entitled to receive, together with all the other facts and circumstances as bearing upon the defendant's guilt or innocence of the crime with which he is charged."

While at other places in his argument the defendant says that he does not concede that this instruction is a correct statement of the law as an abstract proposition, but contends that it is not, we find these statements in his brief and argument: That the trial court's theory in giving the instruction appears to be based on the Iowa cases of Kidd v. Ward, 91 Iowa 371, 376, 59 N.W. 279, and Gregory v. Sorenson, 214 Iowa 1374, 1379, 1380, 242 N.W. 91; and further, "The defendant has no argument with, or objection to, the soundness of the rule in the Kidd and Gregory cases as an abstract statement of the law.

"The defendant's objection to Instruction No. 10 is the

theory stated in the instruction, bottomed on the rule above quoted from the Gregory case, simply and clearly does not apply under the evidence in the record * * *."

The statement then goes on to refer to the evidence upon which the court apparently relied, and which the defendant thinks does not warrant the application of the rule laid down in the instruction. We must therefore assume that the defendant's real quarrel is not with the instruction as a correct statement of the law, but that the facts in the case at bar do not bring the rule as stated into play. In fact, defendant's argument seems to be based upon this thought.

Other Iowa cases which discuss the rule, in addition to Kidd v. Ward and Gregory v. Sorenson, both supra, are State v. Kimes, 152 Iowa 240, 246, 132 N.W. 180; State v. Koller, 129 Iowa 111, 113, 114, 105 N.W. 391; and Harrison v. Harrison, 124 Iowa 525, 526, 527, 100 N.W. 344. A distinction between attempts to suppress testimony, which is properly regarded only as an admission that it would be unfavorable to the party trying to suppress it; and attempts to procure false testimony by bribery, which may be construed as admissions of the falsity of the briber's claims and the unjustness of his cause, is pointed out in Harrison v. Harrison, supra. This distinction seems to be still the rule in Iowa. The trial court in the instant case used the word "influence" without referring to the method thereof, as by bribery. But we think under the facts shown in the record there was no prejudicial error in the wording of the instruction, and further, as we have pointed out, that the point is not in fact argued by the defendant.

Three incidents, referred to by the defendant in argument and by the court in the challenged instruction, form the basis of the controversy here, and it is upon the correct interpretation of the inferences that may be drawn from them that the decision must depend. It becomes necessary to detail the facts relating to these happenings.

The only witnesses for the State upon its case in chief were the three arresting officers named above. It appears there is testimony that on May 26, 1956, ten days before the opening of the trial on the charge filed against the defendant, the defendant, seeing the officers Johnson and Milhan on the street, called

to them to come to him. He then asked them what the trouble was, said "he knew there was hard feelings between us and him he thought and * * * Mr. Milhan said no, there is no hard feelings and he mentioned again he got off on the wrong foot, told us we had him cornered like a rat and we provoked him, irked him, he might called us a few names, but it could be overlooked * * *." This appears from the testimony of Officer James Johnson, with corroboration from Officer Ralph Milhan.

The same witnesses, Johnson and Milhan, testified to another conversation with the defendant which took place about 1:30 a.m. on June 3, 1956, two days before the opening of defendant's trial. Their testimony is that the defendant called to them from across the street, and they went across and talked with him. In substance, the officers say that the defendant said he was sorry he got off on the wrong foot with the police, and still wanted to be friends with them. He asked about the families of the policemen, and when told by Milhan that he had two children, Zbornik said "he was in a position to help our children out if they wanted to go to college after they got out of school, help them out in that way, and not to be afraid to ask for that help." The defendant noticed a leather jacket that Milhan was wearing, and asked Johnson why he "wasn't wearing one." Johnson told him he "couldn't afford it." The defendant then said "if that is the only reason Mike would get me one and if Mike couldn't get it himself he would help him out. He also asked us to come up to his house and eat steak."

The third incident was testified to by the defendant himself upon cross-examination. It occurred sometime within a few weeks preceding the trial. Defendant's version is this: "Pete Robischaud and I were at the Elks Club and Pete says 'Tom, the cops are mad at you.' I says 'What do they want?' He says 'Well, give them a check.' I says 'What do you think would be reasonable?' And he says 'Why don't you give them a check for a hundred dollars?' I says 'That's pretty stiff, isn't it?' and I says 'Make sure I am not proposing this, Pete, you are suggesting this and this is your idea, I will go along with it if you think that is the thing to do, is making a contribution to the kitty.'" The defendant then wrote the check and gave it to Robischaud with the statement "There it is, that is a lot of

money, but I says if it is going to take some of the hate out of their heart okay." It appears, also from the defendant's own testimony, that a few days later Robischaud returned the check to him and he destroyed it. Defendant's objections, sustained by the trial court, prevented identification of Robischaud. There is no showing what was meant by the police "kitty" or in fact whether such a pseudo-feline existed. While this offered donation was not defendant's original idea, he concurred in and implemented it.

It is defendant's strenuous contention that the three incidents detailed above do not justify the giving of Instruction No. 10. That is to say, he urges that there is no showing that he was attempting to bring any improper influence upon the State's witnesses, the police officers Johnson and Milhan, to induce them to give false testimony. With this view we are unable to agree. The conversation of May 26 would not of itself prove an improper motive or support the giving of the questioned instruction. But in view of the following incident of June 3 we think it was properly introduced in evidence as being a part of the history of the efforts of the defendant to contact the officers. It is also true there was nothing said at any time more definite than an expression by the defendant of a hope that the police would "get the hate out of their hearts." But we think it impossible to read the record without reaching the conclusion that an ulterior purpose was present in the defendant's conduct. His interest in the welfare of the police officers and their children and in augmenting the resources of the supposed "kitty" was significantly close to the trial of the pending prosecution against him. Some homespun philosopher has said: "What looks like a duck, and walks like a duck, and quacks like a duck is probably a duck." It is another way of saying that we may draw reasonable inferences from known facts without specific labels.

The reasons which motivate men may often be so apparent that they may be determined though not definitely expressed. It would be unrealistic in the case before us to say that a jury of reasoning people could not properly draw an inference of wrongful purpose in the offers of the defendant to two of the three witnesses upon whom the State's case depended, to buy

them clothing, or feed them, or educate their children. It nowhere appears that he was an intimate friend of these officers, or was in the habit of dispensing such charities on slight acquaintance. It is in no way difficult to reason that he had some motive in what he did, and expected a quid pro quo. The courts are permitted to know what everyone else knows; we should not shut our eyes to the obvious meanings to be deduced from evidentiary facts. Only one reason suggests itself readily for the defendant's conduct in contacting the arresting officers, who were also the important State's witnesses in his case. This is that he hoped to gain some favor by his talks with them, with his offers of aid to Johnson in purchasing a jacket, to both Johnson and Milhan in educating their children, and by his proposed contribution to the supposed police "kitty." This sought-for favor suggests itself readily to the mind as some diminution of the vigor of the police department in its prosecution of the criminal charge then pending and about to be reached for trial, perhaps some weakening of the testimony of the chief witnesses against him. We do not say that this was the only construction to be put upon his ill-advised efforts; only that it was a reasonable one which the jury might well draw. Fraud has its badges, and so do other forms of chicanery and evil doing. As the sage of the foothills so succinctly pointed out, a duck may be recognized as such even though it bears no specific words so naming it. We think the question whether the efforts of the defendant were directed to improperly influencing the adverse witnesses was properly submitted to the jury. The court's reference to "influence" was obviously to wrongful influence.

II. Error is also predicated upon the failure of the trial court to submit the proposed instructions to defendant's counsel before the arguments to the jury. The record shows that the instructions were prepared, and the court thought counsel had seen them. No request was made by counsel before commencing argument, no objection offered, and the matter was in no way called to the court's attention. Counsel were entitled as a matter of right to see the instructions before commencing argument. State v. Holder, 237 Iowa 72, 83, 20 N.W.2d 909, 915; State v. Hartung, 239 Iowa 414, 424, 30 N.W.2d 491, 497. But we are

458

clear that counsel, called upon to argue the case before having seen the instructions, may not proceed so to do without protest and later claim error. Particularly is this true where, as here, the instructions were prepared and available. There is no merit in this assignment.

III. Error is also asserted in argument because the court in the first paragraph of Instruction No. 10 referred to "defendant's admission of having offered money to the police 'kitty'." The complaint at this point is that the court seemed to have stated the "admission" as an established fact, whereas it should have been left to the jury to determine whether it was in fact made. State v. Cotton, 240 Iowa 609, 639, 33 N.W.2d 880, 896, 897, is cited. Here counsel fail to distinguish between matters testified to by other witnesses, as in the Cotton case, and admissions made by the defendant himself in open court.

We have recently decided the point adversely to defendant's contention in State v. Shepard, 247 Iowa 258, 266, 73 N.W.2d 69, 74. We there held definitely that admissions by a party in open court, unexplained and uncontradicted, are to be taken as conclusively true. See also Stearns v. Chicago, Rock Island & Pacific Ry. Co., 166 Iowa 566, 579, 148 N.W. 128, 133.

A study of the entire record brings to light no errors and we conclude the defendant had a fair trial.—Affirmed.

All JUSTICES concur.