# IN THE COURT OF APPEALS OF IOWA

No. 22-0419
Filed February 22, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DUSTIN JAMES SELEY,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Adair County, Thomas P. Murphy, Judge.

A defendant appeals his first-degree murder conviction. **AFFIRMED.**

Raya D. Dimitrova of Carr Law Firm, P.L.C., Des Moines, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and Schumacher and Ahlers, JJ.

**TABOR, Presiding Judge.**

No question, Dustin "D.J." Seley shot his older brother, Timothy Fechter. But Seley maintains it was not first-degree murder. And at trial, he pursued four defenses. He first contested the State's proof that he willfully, deliberately, and premeditatedly killed his brother. Second, he urged that he was too intoxicated to form specific intent. Third, he claimed the shooting was in self-defense. And fourth, he argued Fechter seriously provoked him. A jury convicted Seley of first-degree murder. On appeal, he insists the State provided insufficient proof for the jury to reach that verdict. But on our review, we find the record contains substantial evidence of Seley's guilt for jurors to weigh against his proffered defenses. Giving due deference to their factfinding, we affirm.

## I.    Facts and Prior Proceedings

Seley grew up on a family farm as the youngest of six siblings. His oldest brother, Fechter, was sixteen when Seley was born. Growing up, Seley did not know Fechter well because the older brother was incarcerated. But when Seley was sixteen Fechter got out of prison. That same year, Seley's father died. And the family moved to the nearby town of Creston to be closer to his mother's job. For a while, Fechter stayed on the farm with his wife and step-children. But they left around when Seley quit high school to take over running the farm.

Seley and Fechter did not have a good relationship. Seley recalled fearing Fechter:

> He was my big brother. I was very intimidated, very scared. He was irate most of the time. There was nothing I could ever do that [ ] was good enough for him. . . . [H]e liked . . . to hit people mentally, to keep them down, to kick them. And I always had been fearful of him . . . he could go off at any little moment. You never knew.

Family members agreed that Fechter was nasty. According to their sister, "[Fechter] was very jealous of [Seley], and he put him down all the time." When threatened, Seley "would put his head down, usually start crying." And he "would never stand up" to Fechter. Their mother testified that Fechter "hated" Seley.

Their fraught fraternity was most apparent in three grievances that preoccupied Seley. First, when Seley was nineteen, Fechter framed him for stealing a neighbor's four-wheeler. Second, both brothers had romantic relationships with Nicki, the daughter of Fechter's former wife. Seley and Nicki raised three children together. And Seley sold the family farm when Nicki was pregnant with the first child so they could buy a house in Creston. Soon after they had their third child in 2007, Seley and Nicki broke up. And by 2019, Nicki and Fechter were dating. But Seley suspected the two had been intimate while he and Nicki were still together. The third flashpoint between the brothers came when Seley quit his job to work for Fechter's roofing business in 2021. Seley testified that Fechter enticed him to change employment by professing that "he had so many" roofing jobs but "didn't have anybody" to help. But after only two projects, the work dried up. And Fechter told Seley "there was nothing to do."

That final fallout informs what happened between the brothers in the early morning hours of June 20 that year. The night before, Seley was in Creston "hopping from bar to bar drinking" whiskey. While bar hopping, Seley was armed with a loaded pistol. He claimed he'd been trying to sell the gun "for at least around five days." During his night out, Seley ran into Billy Bird. When the bars closed

around 1:45 a.m., Bird suggested they walk to Fechter's camper because Bird and Fechter were friends. Seley testified he took "acid" before heading to the camper.[1]

When Bird and Seley arrived, they found Fechter with Keagan Trembley—the boyfriend of Fechter's oldest daughter. Trembley testified that Seley came "stumbling" in and admitted that he was drunk. But Bird never came inside and soon left. Trembley recalled Seley talking about "what was going good for [Fechter], and what was going bad for him." Fechter told Seley: "you're drunk," "shut up," and "you need to settle down." Seley and Fechter smoked methamphetamine. Fechter then told Seley to stay at the camper while he and Trembley went to illegally dump some shingles Fechter had in the back of his truck. But Seley cut in, telling Trembley: "I would like to spend some *alone* time with my brother." Seley made sure Trembley understood by pointing his gun, wrapped in a sweatshirt, at him. As Trembley left, Seley told him: "I just saved your life tonight."[2]

During the brothers' drive, things got "kind of heated," according to Seley's testimony. Fechter told him to return to his prior employment. But Seley thought it would be humiliating to ask for his old job back. "[I]t just wasn't right of him to tell me he had all this work." Once at the dumping site, the brothers stripped a tarp off the shingles. As they worked, Seley decided to ask Fechter if he was the father of

---

[1] Other than mentions by Seley, the record includes no discussion of this drug. But commentators explain that "acid is the most common name for lysergic acid (LSD)." Major Catherine L. Brantley, *Spice, Bath Salts, Salvia Divinorum, and Huffing: A Judge Advocate's Guide to Disposing of Designer Drug Cases in the Military*, 2012 Army Law. 15, 37 (April 2012).

[2] Trembley conceded that he did not mention these damning details when interviewed by police several times. He only brought them up once called as a witness.

his and Nicki's oldest child. Fechter confirmed "that [the child] was his." Seley testified that upon hearing that confirmation, he became "enraged" and attacked his brother:

> I blacked out. Basically, I don't even remember if I hit him, if I shot him or not. I know that we got into a fistfight prior, kind of like during the same time. When I pulled it, I remember falling off the tarp, tripping on the tarp. And as I was falling backwards I was pulling the trigger on the gun.

After the shooting, Seley drove off in his brother's truck. Yet he called Fechter nine times after: "I kept calling his phone because . . . I just wanted him to pick up. I just wanted it to be like . . . it was just a bad dream." Fechter had left his cell phone, set to silent, on the dashboard of the truck. Seley testified that he drove around much of the night "hoping to see" his brother. But the alleged search proved difficult because he "was blacked out," "intoxicated," and "[t]he acid was kicking in." At some point, Seley tossed his gun into a ditch.

Later that morning, Trembley tried to contact Fechter with no success. When Fechter didn't show up for a second day, Trembley reported him missing. Trembley found Fechter's camper had been "ransacked." It also reeked of bleach. As he was leaving the camper, Trembley spotted Seley's clothes in a trash can. When he looked in Fechter's truck, Trembley found a "bullet shell" and a bag of methamphetamine. Later, he found Seley's wallet on the passanger side.

Meanwhile, Seley hid out for nine days. On the first day, Seley called two of his children to tell them Fechter "was gone" and that he killed him.[3] Later, Seley discarded his phone after hearing from his probation officer that police wanted to

---

[3] Both children testified that they rarely talked with Seley on the phone.

talk to him. Seley then bought a flip phone in Greenfield.[4] At some point, Seley did return to Creston for gas and to hang out with his friend Dakota Brown. Brown testified that while the two smoked methamphetamine, Seley confided that "he put [Fechter] down on his knees, and he shot him several times, and then he stomped his head in." Seley also told Brown he went back to Fechter's camper "changed clothes, [and] slept in his bed." Brown recalled he'd never seen Seley "so happy before in my life." Police arrived at Brown's residence minutes after Seley left.[5]

On June 29, Seley again returned to Creston, led police on a chase, and was arrested.[6] During his police interview, Seley acknowledged that Fechter "set me off that night." But Seley did not admit to shooting Fechter. Instead, he claimed that Fechter made a joke about the four-wheeler theft, prompting Seley to drive off—leaving Fechter at the dump site. Seley embellished that version, saying a downpour made it impossible to go back for Fechter. He told officers, "I wish I could sit here and say I regret leaving him on that fucking road. But that was the first time I ever stood up for myself." Throughout the interview, Seley repeated his frustration with Fechter's "bologna story" about having a ton of roofing work and making a "fucking fool" out of him by asking him to go back to his old job.[7] Two days after the interview, police found Fechter's body.

---

[4] According to the phone's data, Seley returned to the area where he killed Fechter three days after leaving town.

[5] On cross, the defense highlighted that police found methamphetamine in Brown's home, but did not charge him with possession.

[6] Seley testified that "at that point I was honestly going in to talk to the police. I was going to call and go in and turn myself in and talk to them that day."

[7] At trial, Seley testified the police interview was "mostly all bullshit." And that he'd been drinking alcohol and smoking methamphetamine while out of town, and was sleep deprived.

The State charged Seley with first-degree murder one month later. Seley gave notice that he intended to rely on the defenses of intoxication and self-defense. At trial, the jury heard testimony that Fechter had a quick temper and was mentally and physically abusive to people—including Seley. Seley testified in his own defense. He conceded he was angry with Fechter, but denied having a plan to shoot him. Seley claimed he became "enraged" when Fechter admitted being the father of Seley's oldest child. But he also testified that he did not shoot Fechter on purpose, instead pulling the trigger as he was falling backwards. And Seley spoke to his level of intoxication on the night of the murder.

Michele Catellier, associate state medical examiner, testified that Fechter suffered a single gunshot wound to the back of the head fired at close range. The trajectory of the bullet was from "the lower part of his body to the top part." Dr. Catellier suspected, but could not confirm, the gun was pressed to the back of Fechter's head. Fechter also had blunt force injuries to his skull that were inflicted near the time of his death.

Dr. Catellier also testified that toxicology samples showed Fechter had consumed methamphetamine before his death. She explained that methamphetamine was "a complicated drug" with "both stimulant and sedating properties." She added that "the part of the body that's affected by methamphetamine is . . . the fight-or-flight part." And she confirmed that users can feel "some euphoria" as well as agitation, confusion, and hallucinations.

After a five-day trial, the court instructed the jury on the necessary elements of first-degree murder and on Seley's defenses. The jury found Seley guilty as charged. He now appeals.

## II.    Analysis

On appeal, Seley argues the State presented insufficient evidence for the jury to convict him of first-degree murder.  The district court instructed the jury that the State had the burden to prove:

1.  Seley shot Fechter.

2.  Fechter died as a result of being shot.

3.  Seley acted with malice aforethought.

4.   Seley acted willfully, deliberately, premeditatedly, and with a specific intent to kill Mr. Fechter.

5.  Seley was not justified.

Seley does not contest that he shot and killed Fechter.  But he claims the State failed to meet its burden otherwise.  First, in not showing that Seley willfully, deliberately, and premeditatedly killed his older brother.  And then in failing to rebut his three defenses of intoxication, justification, and provocation.

We review his sufficiency claim for correction of legal error.  *See State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022).  We consider the evidence "in the light most favorable to the State," allowing for all reasonable inferences.  *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).  If a rational jury could find guilt beyond a reasonable doubt, we affirm.  *Id.*  While we consider all evidence—exculpatory and inculpatory alike—we are mindful in our standard of review that the jury is "free to reject certain evidence, and credit other evidence."  *Id.*

### A.  Willfulness, deliberation, and premeditation

We begin with Seley's argument that the State did not prove that the shooting was willful, deliberate, and premeditated.  Let's start by defining terms.

Willful means "intentionally and not accidentally." *State v. Roberts*, No. 18-0575, 2019 WL 1953679, at *3 (Iowa Ct. App. May 1, 2019) (citation omitted). Deliberate means "weighing the considerations for and against the act." *State v. Hofer*, 28 N.W.2d 475, 483 (Iowa 1947). And premeditated means "to think or ponder before acting." *State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003).

Each of these states of mind "must exist before and at the time" of the killing. *State v. Wilson*, 11 N.W.2d 737, 754 (Iowa 1943). But not for any particular length of time before the fatal act. *Id.* ("The question is, not only did the accused have time to think, but did he think."). And the State can prove deliberation and premeditation through circumstantial evidence of planning, motive, or the nature of the killing itself. *State v. Helm*, 504 N.W.2d 142, 146 (Iowa Ct. App. 1993).

Viewing the record in the light most favorable to the verdict, we find ample circumstantial evidence that Seley acted with the requisite mental states. For evidence of planning, we look to Trembley's testimony. Pointing his gun at Trembley, Seley ominously said he wanted "to spend some *alone* time" with Fechter, and that by leaving Trembley behind, Seley had "saved [his] life tonight."

Turning to motive, the record brimmed with evidence of the brothers' toxic relationship. Family members testified to Fechter's history of tormenting his younger brother. And Seley himself told the jury about his grievances against Fechter. Taking the fall for a stolen four-wheeler. Job promises unfulfilled. And his first-born child not his own. "The prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the

time of the crime. *State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006) (citations omitted).

As for the nature of the killing, the jury could have believed Brown's testimony that Seley gleefully recounted putting Fechter "down on his knees" before shooting him and stomping on his head. *See State v. Frazer*, 267 N.W.2d 267 N.W.2d 34, 39 (Iowa 1978) ("The use of a deadly weapon accompanied by an opportunity to deliberate, even for a short time, is evidence of malice, deliberation, and premeditation."). That version of events was corroborated by Dr. Catellier, who believed that Fechter was shot at close range and suffered other blunt force injuries to his skull. The brutality of the killing serves to "refute any suggestion of inadvertence or mistake and supply strong evidence of malice and intent to kill."[8] *State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981).

While Seley argues that the State offered insufficient evidence of premeditation or deliberation, his true contention appears to be that the jury believed the wrong testimony. But weighing the evidence and accepting or rejecting parts of Seley's testimony was the jury's prerogative—not ours. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). Thus, viewing the evidence in favor of the verdict, a rational jury could find beyond a reasonable doubt that Seley willfully, deliberately, and premeditatedly killed Fechter.

---

[8] On top of this, Seley's conduct after killing Fechter betrayed a consciousness of guilt. He did not call the police. And he discarded the murder weapon. He then left town for nine days, shedding his cell phone when he learned police were looking for him. And when law enforcement interviewed him, he did not tell them Fechter was dead, essentially saying, "Am I my brother's keeper?" *Hickory v. United States*, 160 U.S. 408, 415 (1896) (invoking the biblical story of Cain and Abel). And then he later admitted his answers were "bullshit."

**B. Intoxication**

Seley next claims that the State failed to show he had the specific intent to kill Fechter. Specific intent requires proof that Seley was aware of his acts and did them with a specific purpose. *See State v. Guerrero Cordero*, 861 N.W.2d 253, 259 (Iowa 2015), *abrogated on other grounds* by *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). To prevail on his intoxication defense, Seley must show he was so drunk or high that he "could no longer reason and was incapable of forming a felonious intent." *See id.* When a defendant invokes the intoxication defense, "the State retains the burden of proving the element of specific intent." *State v. Templeton*, 258 N.W.2d 380, 383 (Iowa 1977).

According to Seley, his history of drug use along with his consumption of alcohol and other drugs before shooting Fechter left him unable to form murderous intent. He relies on his own testimony about drinking whiskey, taking acid, and then smoking methamphetamine. He contends his actions following the murder—including calling Fechter's cell phone and driving around looking for him as if he were still alive—supported his defense. He also highlights Trembley's testimony corroborating his intoxication. And he directs us to Dr. Catellier's testimony on the general effects of methamphetamine.

Viewing the evidence in the light most favorable to the verdict, we find a reasonable jury could conclude that Seley had the specific intent to kill Fechter. The court instructed jurors they could infer Seley possessed specific intent to kill when firing the gun so long as he had a chance to deliberate. *See State v. Wilkens*, 346 N.W.2d16, 20 (Iowa 1984). And based on what Seley told Brown, Seley had time to deliberate when forcing Fechter to his knees before shooting him.

Further, Seley's testimony supports the jury's conclusion. He recalled specific conversations he had with his brother on the way to the dump site. He also could describe details of the fight days later to Brown and then on the stand. *See Hicks*, 2018 WL 1433788, at *7 (finding sufficient evidence of specific intent because Hicks could "provide a detailed account of his actions the day before the attack and the day of the attack"); *see also Guerrero Cordero*, 861 N.W.2d at 259 (finding resolving claims of intoxication is "entrusted to the jury based on the facts of each case").

### C. Justification

Next, Seley contends he shot his brother in self-defense. The State bears the burden "to prove justification did not exist." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Iowa Code § 704.3 (2021). Justification is both subjective and objective. *State v. Elam*, 328 N.W.2d 314, 317 (Iowa 1982). "The actor must actually believe that he is in danger and that belief must be a reasonable one." *Id.* To rebut this defense, the State had to prove either: (1) Seley started or continued the incident, (2) Seley had an alternative course of action available, (3) Seley did not believe he was in imminent danger of death or injury and his use of force wasn't necessary to save him, (4) Seley did not have reasonable grounds for his belief, or (5) the force used by Seley was unreasonable. *See State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006).

Looking at the record, we find Seley's own testimony dooms his claim:

> Q. Now, did you say that after he told you [your first-born was] not your child there was a—. A. Yeah.
> Q. A fistfight? A. Yes, I hit him, I punched him, and we got into a quarrelsome fight.
> Q. Okay. And *then* you shot him? A. I did.

Based on this testimony, a jury could reasonably believe that Seley started the altercation by punching Fechter after he confirmed he was the father of Seley's child. In Seley's own words, that punch led to "a quarrelsome fight" ending when he shot Fechter. And beyond starting the fight, Seley's use of force was unreasonable because he "brought a [gun] to a fistfight—he used lethal force without any indication that he faced danger that made it reasonably necessary" to shoot the unarmed Fechter. *See State v. Bowers*, No. 18-1827, 2020 WL 1310290, at *2 (Iowa Ct. App. Mar. 18, 2020). Based on the evidence, the jury could determine Seley "escalated the level of force beyond what was reasonable under the circumstances." *See State v. Hall*, No. 15–0628, 2016 WL 2748358, at *4 (Iowa Ct. App. May 11, 2016). Thus, we cannot reverse on justification grounds.

**D. Provocation**

Turning to Seley's final claim, he asserts the jury should have found Fechter provoked the shooting. Generally, serious provocation can reduce an offense from murder to voluntary manslaughter. *See State v. Ambrose*, 861 N.W.2d 550, 558 (Iowa 2015) ("Provocation is the linchpin of the crime of voluntary manslaughter."). And provocation is serious when it is "sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill." Iowa Code § 707.4.

To be seriously provoked is both subjective and objective. *State v. Thompson*, 836 N.W.2d 470, 477 (Iowa 2013). Subjectively, "the defendant must act solely as a result of sudden, violent, and irresistible passion." *State v. Inger*, 292 N.W.2d 119, 122 (Iowa 1980). Objectively, the defendant must be provoked in a way "sufficient to excite such passion in a reasonable person." *Id.* Further, the State can rebut this defense if there is "an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill." *Id.* And because Seley used a gun, "the provocation must be great, indeed, to lower the offense from murder to manslaughter." *State v. Holder*, 20 N.W.2d 909, 914 (1945) (citation omitted).

To show serious provocation, Seley relies on his testimony that right before the shooting, Fechter confirmed the paternity of Seley's child:

> [J]ust the shock of him telling me and saying that [my first-born] was his child and everything that I gave up and *everything I got rid of in my life for him*, I was enraged. I was so angry. I was not thinking at all. I didn't know where I was.

Based on this revelation, Seley contends no reasonable jury could reject his claim of serious provocation.

We disagree. If true, Fechter's confirmation—alone—could not be serious provocation. *See Thompson*, 836 N.W.2d at 478 ("words alone, historically, have been insufficient to provide a factual basis for serious provocation"). Plus, in his police interview, Seley did not mention the paternity issue. Instead, he brought up other resentments—including Fechter framing him for theft when he was nineteen and making a "fucking fool" out of him recently by limiting his job options. The jury could believe Fechter did not act solely based on the "sudden, violent, and

irresistible passion" he felt from the revelation. *See State v. Wadsworth*, No. 19-0698, 2020 WL 2487618, at *2 (Iowa Ct. App. May 13, 2020) (stating that "a long-simmering anger . . . does not establish a 'sudden' passion").

To recap, the State presented substantial evidence that Seley committed first-degree murder. The court instructed the jurors on Seley's alternative defenses of intoxication, justification, and provocation. From there, it was for the jury as fact finder to resolve those questions—not us. And the jury could believe as much or as little of Seley's testimony as it desired. *See Sanford*, 814 N.W.2d at 615.

**AFFIRMED.**