STATE OF IOWA, appellee, v. DARLENE MCNAMARA, appellant.

No. 49858.

(Reported in 104 N.W.2d 568)

20

AUGUST 2, 1960.

REHEARING DENIED OCTOBER 21, 1960.

Pruss & Flores, of Cedar Rapids, and Moyer & Allen, of Marion, for appellant.

Norman A. Erbe, Attorney General, and Marion R. Neely, Assistant Attorney General, both of Des Moines, Richard F. Nazette, Linn County Attorney, and Keith E. Stapleton, Assistant Linn County Attorney, both of Cedar Rapids, for appellee.

GARRETT, J.—The defendant was convicted of the crime of murder in the second degree. She admitted that on January 10, 1959, she shot her common-law husband, Edward Francis McNamara, at their home near Central City, Iowa, with a .22 caliber rifle thus causing his instantaneous death. She alleged she acted in justifiable self-defense.

I. The defendant claims that when she fired the fatal shot she was actuated by fear her husband was about to do her great bodily harm. There may have been some basis for such fear but the jury found otherwise and we cannot say, on the record here, that there was not sufficient competent evidence to sustain the verdict.

There is much evidence the defendant frequented taverns and drank beer to the point where, on some occasions, she became noisy and quarrelsome with her husband and with the State's principal witness, Charles I. Smith.

Owen Brislawn, employer of the deceased, testified that in December 1958 he went to the McNamara home to see if Eddie was ready to go to work. At that time he had a conversation with the defendant and she said Ed had just gotten home at six that morning with Gene Haas, and she said she should have " 'got the gun out and shot both the sons-of-bitches.' " When asked if she said anything further, the witness testified, "she said she should have done that and called it accidental." The witness was asked, "As a matter of fact the morning you went out to the house, and Ed was unable to go to work, didn't you suggest to her that she should shoot him? Isn't that what hap-

pened? A. I don't recall that. Q. It was all a big joke, though, wasn't it? A. I don't know. * * * Well, that's the way I took it at the time, yes."

It appears in the record without dispute that on one occasion in a tavern the defendant hit her husband on the head with three different beer bottles, breaking one of them.

Charles I. Smith, known in the testimony as "Chuck", testified he was at work in Cedar Rapids when defendant called him by telephone and asked him to come to Central City to get her and take her to Waterloo. Smith left his work on the night shift, borrowed his brother's pick-up truck and drove as directed to a tavern in Central City. Smith, although he had a wife and seven children, had been on intimate terms with defendant and there was testimony that McNamara had threatened violence to her and Smith if he found them together. Smith testified that prior to defendant's common-law marriage to Eddie McNamara, he lived with her maybe a day or two at a time and that after he started going with her she was living on week ends with Bill Jenkins; that she was later married to a man named Fred Cook and after that she married Frank Cole, all during the time Smith was going with her.

The evidence disclosed the deceased knew defendant was going with Smith in his truck, as he was in front of the tavern where Smith picked up defendant and he knew Smith was to drive her home for the purpose of getting some clothes and her dog preparatory to going to Waterloo. Appellant stated she and Smith had been at the home only a few minutes when Eddie and someone she did not know drove up in the latter's car.

Defendant's account of what happened appears sufficient to sustain the verdict:

"Q. Now, when did you first see Eddie as you walked out the door? A. As I walked out the door Eddie was just coming up in front of the headlights of the truck; he had went over to this car parked more in front of the truck and up by that hill that is there; he walked up to the car and said something to the man and he started back and he was about in front of the truck when I started out the door. * * * A. He was coming around the front of the truck, and I went around back of the

truck. Q. Was the endgate down or up? A. It was up. Q. Did you crawl over the endgate? A. Yes I did. Q. After you crawled over the endgate what did you do? A. I just stood there—and I hollered to Chuck to leave. Q. You had the rifle with you? A. Yes, I had it with me. * * * Did Eddie say anything at all to you? A. Eddie just said, 'You are not leaving'—he said to Chuck, 'You are not taking her anywhere—you are not leaving.' * * * Q. Was there any conversation at all, that you heard, between Eddie and Chuck? A. Just when Eddie told him I wasn't leaving with him. Q. What did Chuck say to that? A. He didn't answer him. Q. After you got up in the back end of the truck what did Eddie do? A. Eddie crawled up in the back end of the truck, too. Q. And you saw him when he crawled up? A. Yes, I did. * * * Q. He didn't have anything in his hands at that time? A. No. * * * A. I told him to stay away from me. Q. And what did you do then? A. I didn't do anything—he just grabbed hold of me and threw me out of the back of the truck. Q. When he threw you out of the back of the truck were you still holding the rifle? A. No; he grabbed it out of my hands, and threw me. * * * He grabbed hold of the rifle and jerked it from me, and threw me off balance—right on out the back of the truck. Q. Did he jump out the back of the truck, too? A. No, he didn't, because I got back in the truck. Q. You crawled back in? A. Yes, I did. Q. Why? A. I wanted to get that gun away from him. * * * Q. As you got up in the back of the truck he had the rifle? A. He had the rifle. Q. Did you crawl over the endgate again? A. Yes. Q. Did you stand up in the back of the truck? A. Yes, I went and grabbed hold of Eddie then. Q. Did you grab the rifle? A. No, I didn't get hold of the rifle—I grabbed hold of him—and that's when Chuck jerked the truck. Q. What happened? A. We both fell out the back end. * * * Q. You picked up the rifle? A. Yes, I did. Q. What did you do then? A. I started towards—backing towards the house away from Eddie, by then he was standing up and coming towards me. * * * Q. Eddie didn't have anything in his hand at that time? A. No, he didn't have anything in his hand. Q. He didn't say anything to you at all? A. No. Q. And then did you pull the trigger? A. I

must have. Q. You heard a shot, didn't you? A. I don't even remember hearing a shot then. Q. Did Eddie fall down? A. Yes, he did."

On January 11, 1959, the defendant signed two voluntary statements, State's Exhibits 26 and 27, in one of which she said, "Ed came to the house and shouted to Smith 'she is not going to leave here.' An argument between Ed and I followed. He slapped me across the face. I seized our .22 caliber rifle and during the argument shot Ed. This occurred in front of the house. I helped him in the house, where he fell to the floor."

There was testimony by Smith that McNamara was shot by defendant when McNamara and defendant were both in the cargo box of the truck, thus creating a discrepancy, but not a material one, in the evidence as to the circumstances of the shooting. The jury upon the State's evidence in chief could well find that when defendant fired the fatal shot she did not do so in apprehension that great bodily injury was about to be inflicted upon her or that her life was in danger. It is true she was on her own premises so to speak, but there is nothing in the record to show that she was in greater danger then than she had been in on prior occasions at the hands of her husband. There is no evidence that at their home or elsewhere that night McNamara threatened her or Smith further than to say she was not going anywhere.

II. Appellant urges that the court erred in failing to sustain her motion for a directed verdict at the close of the State's evidence and in failing to withdraw the issues of first- and second-degree murder from the consideration of the jury.

██ In passing upon the sufficiency of the evidence to sustain a verdict the State's evidence must be considered in the light most favorable to the State. State v. Myers, 248 Iowa 44, 79 N.W.2d 382; State v. Williams, 245 Iowa 401, 62 N.W.2d 241; State v. Johnson, 243 Iowa 1319, 55 N.W.2d 196; State v. Rutledge, 243 Iowa 179, 47 N.W.2d 251; State v. Rutledge, 243 Iowa 201, 50 N.W.2d 801.

After careful consideration of the evidence, we are of the opinion the State's evidence, including the signed statements of the defendant herself, adequately supports the verdict of the

jury and that the court committed no error in refusing to direct a verdict of acquittal as requested by the defendant.

In a criminal action the cause should be submitted to the jury, and the court should not direct a verdict of acquittal if there is any substantial evidence reasonably tending to support the charge. State v. Miskell, 247 Iowa 678, 73 N.W.2d 36, and cases there cited.

Where one kills another who has placed him in imminent fear of death or great bodily injury he may defend on the ground such homicide was justifiable in self-defense, the question being for the jury to determine. Defendant's statement in Exhibit 27 that "There was a rifle standing by the door in the front room and I went to get the rifle as I was afraid that Ed might use it on Chuck as he had warned Chuck many times to stay away from me" indicates defendant was afraid for Smith but not for herself.

The defendant states that the State failed to prove a motive for the killing except the motive of fear. Of course motive is not a necessary element of the State's case but a lack of it may be considered in determining whether there was malice on the part of the defendant.

"The use of a deadly and dangerous weapon in a dangerous manner raises a presumption of malice, and therefore murder in the second degree." State v. Myers, supra, at page 56 of 248 Iowa, citing State v. Christie, 243 Iowa 1199, 53 N.W.2d 887, 54 N.W.2d 927; State v. Leib, 198 Iowa 1315, 201 N.W. 29; State v. Phillips, 118 Iowa 660, 92 N.W. 876. The intent to kill may also be inferred from the use of a deadly weapon in a deadly and dangerous manner. An assault with a deadly weapon implies malice, an essential element of the crime of murder, and if death ensues the presumption is warranted that such killing was with malice aforethought, unless there is an explanation to the contrary showing a legal excuse, such as self-defense. State v. Fischer, 245 Iowa 170, 60 N.W.2d 105; State v. Haffa, 246 Iowa 1275, 71 N.W.2d 35, and cases cited.

"It must be conceded the Iowa rule is that the State must prove beyond a reasonable doubt that the accused did not

act in self-defense." State v. Haffa, supra. Quoting further from page 1289, we said: "The rule is well settled, to justify homicide on the ground that it was committed in self-defense, four elements must be present: (1) the slayer must not be the aggressor in provoking or continuing the difficulty that resulted in the killing; (2) he must retreat as far as is reasonable and safe before taking his adversary's life, except in his home or place of business; (3) he must actually and honestly believe he is in imminent danger of death, great bodily harm, or some felony, and that it is necessary to take the life of his assailant to save himself therefrom; and (4) he must have reasonable grounds for such belief. State v. Holder, 237 Iowa 72, 20 N.W.2d 909; State v. Emery, 236 Iowa 60, 17 N.W.2d 854; 26 Am. Jur., Homicide, section 126, page 242."

██ We think the jury, on the record in this case, had ample basis for finding that elements (3) and (4) were not present. The State has the burden of proving all elements of the crime charged beyond a reasonable doubt. We think the evidence was such that the jury could find beyond a reasonable doubt that defendant did not actually and honestly believe or have reasonable grounds for believing she was in imminent danger of death, great bodily harm or some other felony and that it was necessary to take the life of her husband to save herself therefrom. In State v. Haffa, supra, we said: "It is well settled that where the evidence is conflicting or of such a character that different inferences might reasonably be drawn, it is a question of fact for jury determination as to whether or not the defendant acted in self-defense. State v. Holder, supra."

██ "Deciding fact issues is the province of the jury and its verdict on conflicting and supporting evidence is conclusive on appeal." State v. Miskell, 247 Iowa 678, 687, 73 N.W.2d 36, 41. If the credible evidence is in conflict the verdict is binding upon us. State v. Williams and State v. Johnson, both supra, and citations.

III. It is claimed the court erred in unduly restricting defendant in cross-examining the State's principal witness, Charles I. Smith, and in not allowing her to testify regarding the mo-

tives, bias and prejudice of Smith in respect to his reasons for giving false testimony against her.

We have examined the record carefully and find no abuse of discretion on the part of the trial court in the respects charged. The court necessarily has large discretion in such matters and while it might, perhaps, have been justified in permitting some further cross-examination along the line involved, we are of the belief such liberality would not have materially aided the defendant and that she was not prejudiced by the rulings.

 A defendant is entitled to cross-examine the State's witnesses to test their credibility and the accuracy of their knowledge of the subject matter. Clearly the motives, bias and prejudice of witnesses are proper subjects of cross-examination. It appears to us all such matters were rather fully presented so far as the witness Smith was concerned.

IV. Prior to the trial the defendant and her counsel made arrangements with the county attorney to have the defendant take a polygraph or "lie detector" test. Pursuant to such plan, the defendant, her attorney and a deputy sheriff signed a so-called release Exhibit No. 39 as follows:

"January 30, 1959 I, Darlene McNamara, do hereby voluntarily, without duress, coercion, promise of reward or immunity, submit to examination by the polygraph (lie detector) detection of deception technique. The examiner may give his professional opinion as to the results of said examination, to law enforcement and judicial officers and other appropriate officials, and that said examiner may testify in a Court of Law as to his opinion as to the results of said examination. Francis J. Pruss, Phil Hoover, witnesses; s/Darlene McNamara."

The test was made at the office of Professor Richard Holcomb, Chief of the Bureau of Police Science, at the State University of Iowa. The defendant was asked some informal questions, the procedures were explained to her to some extent and she was then asked five questions: "(1) Were you standing in the truck when you shot Ed McNamara? (2) Did you reload the twenty-two rifle the night Ed was shot? (3) Did you try

to shoot Charles Smith after you shot McNamara? (4) Were you in the truck when Charles Smith left the yard? and (5) Did you force Charles Smith out of the truck with the rifle?" Her answer to each question was "No". Professor Holcomb testified that in his opinion all five answers were untrue.

At the trial defendant strenuously objected to any evidence regarding the tests on the ground they were unreliable and prejudicial. Did the court err in permitting such testimony over proper objection in view of defendant's agreement? She and her able counsel requested that the tests be made and agreed as set out in Exhibit No. 39. The weight of authority in the courts of last resort is against receiving evidence of such tests in criminal cases either for or against the defendant. An authority on the subject of lie detection was published in 1953 by Inbau and Reid entitled "Lie Detection and Criminal Interrogation" and states at page 127: "Although the present lie-detector technique, when used under the favorable conditions previously outlined, permits a very high degree of accuracy, there are other factors to consider before concluding that the time has now arrived for the admission of test results in evidence. First of all, consideration must be given to the fact that the technique is still in a relatively early stage of development. It has not yet become standardized as to test procedure, examiner qualifications, or even instrumentation itself. Much more remains to be done and accomplished before the courts should be urged to generally admit test results as evidence."

Appellant cites many authorities to sustain her claim that such tests are not yet recognized as competent and trustworthy evidence in the courts. In State v. Bohner (1933), 210 Wis. 651, 658, 246 N.W. 314, 317, 86 A. L. R. 611, 615, the defendant offered to prove by Professor Leonarde Keeler, one of the leading experts in the field of lie detection, that the defendant was not in the city when the crime was committed on the date thereof. The court said, "While it may have some utility at present and may ultimately be of great value in the administration of justice, it must not be overlooked that a too hasty acceptance of it during this stage of its development may bring

complications and abuses that will overbalance whatever utility it may be assumed to have."

In Stone v. Earp (1951), 331 Mich. 606, 50 N.W.2d 172, it was held error to admit evidence of the results of the polygraph test but that error was not prejudicial for reasons stated. In the case at bar the defendant expressly in writing agreed and stipulated that the evidence of Professor Holcomb as to the polygraph tests might be received. Exhibit No. 39 was denominated a "Release", but it was more than that. She agreed and stipulated that "said examiner may testify in a Court of Law as to his opinion as to the results of said examination." The release was signed only after negotiations between defendant's counsel and the county attorney, and after the above quoted portion thereof was typed as an addition to the printed form. In view of her agreement made with the approval of her able attorney she should not now be permitted to detract her agreement because the test proved unfavorable to her.

In The People v. Houser, 85 Cal. App. 2d 686, 694, 695, 193 P.2d 937, 942, it is said: "The next point involves the testimony pertaining to the lie-detector test. It is claimed that such evidence has no evidentiary value and that such class of evidence is not regarded by the courts and therefore it was improperly admitted. It appears from the written stipulation signed by defendant and his counsel, that the operator thereof * * * is an expert operator and also an expert in interpreting results of such tests. It was likewise stipulated that such evidence, i.e., 'the question propounded by said operator and the answers given by said defendant and the recordings of said defendant's reactions thereto and everything appertaining to said test and the entire results of said tests including the opinions of said operator be received in evidence * * *'. It would be difficult to hold that defendant should now be permitted on this appeal to take advantage of any claim * * * such evidence was inadmissible * * *."

See State v. Lowry, 163 Kan. 622, 185 P.2d 147. We hold the lie-detector-test evidence was admissible by reason of her agreement.

**30**

V. In Division IV in appellant's Brief and Argument error is claimed in allowing the State to introduce certain incompetent evidence and in excluding certain material and relevant evidence. It is sufficient to say here that we find no errors in this respect which were prejudicial to the defendant.

VI. It is urged the court erred in failing to instruct the jury that the defendant was under no duty to retreat while upon her own premises. We have examined the challenged Instruction No. 15 and have compared it with defendant's Requested Instruction No. 6 which states in part: "If it is evident to the assaulted that the danger which appears to be imminent can be avoided in any other way, as by retreating from the conflict, the taking of the life of the assailant is not excusable. * * * But if you find that she did use greater force or means than appeared necessary to protect herself from great bodily harm, as an ordinarily prudent and cautious man or woman under the circumstances, in which she was then placed, including the nature and manner of the assault, you cannot acquit her on the grounds of self-defense", and are of the opinion the Requested Instruction No. 6 justifies the court's Instructions Nos. 15 and 16.

Appellant also objects to Instruction No. 22 in which the court instructed the jury that if she consented that the person conducting said test might testify in court as to the results of the test, then such evidence regarding the lie-detector test should be given such weight as "you think it is entitled to receive, taking it into consideration along with all of the testimony introduced in this case in determining the guilt or innocence of the Defendant." We hold this instruction was proper in view of our holding in Division IV.

For all the reasons above stated, we must affirm.—Affirmed.

LARSON, C. J., and GARFIELD, HAYS, THOMPSON, PETERSON, and THORNTON, JJ., concur.

OLIVER, J., not sitting.