PEOPLE v JOESEYPE JOHNSON

OPINION OF THE COURT

1. HOMICIDE—SELF-DEFENSE—DEADLY FORCE—SECURITY GUARDS—
   DUTY TO RETREAT.
   A private security guard hired by a theater to maintain order
   and protect business invitees has no obligation to retreat when
   acting in the course of his employment, but may meet deadly
   force with deadly force; whether a guard charged with homicide
   exceeded the bounds of the law when he employed deadly force
   during a confrontation with a noisome theater patron is a
   question for decision by a properly instructed jury.

2. HOMICIDE—SELF-DEFENSE—EVIDENCE.
   One accused of a homicide who was not required to retreat when
   faced with deadly force must still, to avail himself of the
   defense of self-defense, produce evidence (a) that his own ag-
   gressive acts did not precipitate the conflict, (b) that he enter-
   tained an honest belief at the time that he was in imminent
   danger of death or serious bodily harm, and (c) that his only
   recourse lay in physically repelling the attack.

CONCURRENCE BY ALLEN, P. J.

3. HOMICIDE—SELF-DEFENSE—RETREAT.
   *Retreat, even if possible, should not be absolutely required in all
   cases of homicide to make the defense of self-defense available;
   however, a failure to retreat when retreat is possible is a
   circumstance which the jury may consider in determining
   whether a defendant was justified in using deadly force.*

## Appeal from Recorder's Court of Detroit, Elvin

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 40 Am Jur 2d, Homicide §§ 160, 162–169, 480.
   Homicide: Duty to retreat as condition of self-defense when one is
   attacked at his office, or place of business or employment. 41
   ALR3d 584.
   Homicide: Extent of premises which may be defended without
   retreat under right of self-defense. 52 ALR2d 1458.

L. Davenport, J. Submitted January 4, 1977, at
Detroit. (Docket No. 26753.) Decided May 2, 1977.
Leave to appeal denied, 401 Mich 803.

Joeseypé Johnson was convicted of second-degree
murder. Defendant appeals. Reversed and re-
manded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Re-
search, Training and Appeals, and *Willie G. Lip-
scomb, Jr.,* Assistant Prosecuting Attorney, for the
people.

*George C. Edwards, III,* for defendant on appeal.

Before: ALLEN, P. J., and D. E. HOLBROOK and
D. C. RILEY, JJ.

D. C. RILEY, J. Following a jury trial and convic-
tion on a charge of second-degree murder, MCLA
750.317; MSA 28.549, the trial court meted out a
sentence of life imprisonment to defendant Joe-
seype Johnson. Defendant now appeals raising
four claims of error. We reverse on one and re-
frain from addressing the others since they are
unlikely to recur on retrial.

The facts surrounding the death of George
Peaks were hotly contested at trial. Undisputed
testimony reveals, however, that on August 12,
1974 Mr. Peaks entered the Colonial Theater in
Detroit accompanied by a man and two women at
approximately 2:30 a.m. Mr. Peaks approached the
concession stand, purchased a container of popcorn
and asked the attendant, Ms. Gladys Campbell, for
some salt. Ms. Campbell pointed to a red plastic
container designed to dispense catsup and in-
formed Mr. Peaks that the salt was in the catsup

container. Mr. Peaks balked at the idea of using the catsup container, claiming it was unsanitary, and demanded that he be given a regular salt shaker. Ms. Campbell explained that prior patrons had taken the theater's salt shakers and that the catsup container was the only available dispenser of salt.

Unmollified, Mr. Peaks continued to protest loudly. The theater manager, Mr. Frederick Kregear, hearing the disturbance, approached Mr. Peaks and discussed the problem for two or three minutes. Being unable to satisfy Mr. Peaks, the manager then summoned the defendant who was stationed at the theater as a private guard in the employ of the Gardner Security Agency. The manager then withdrew as defendant attempted to ascertain what was wrong. After learning of Mr. Peaks's complaint, defendant asked Ms. Campbell to return the purchase price of the popcorn; she complied by placing 68 cents on the counter.

In the meantime, a number of theater patrons, variously estimated at 15 to 30 persons, sensed the dispute, left their seats and entered the lobby apparently to satisfy their curiosity.

At this point the facts are controverted. Defendant claimed that Mr. Peaks refused the money, spoke derisively of defendant, punched defendant in the jaw and then reached into his coat pocket, at which time defendant out of mortal fear pulled his gun, while falling backward from the punch, and shot Mr. Peaks once in the chest. Others testified that defendant poked Mr. Peaks two or more times in the chest with a flashlight as defendant was returning the coins, that Mr. Peaks attempted merely to ward off the jabs of the flashlight but did not otherwise resist, and that Mr. Peaks stumbled backward and was then shot

by defendant. It is unclear when defendant pulled his gun. Some said defendant had drawn his weapon at the start of the affray; others testified that he pulled it only a moment before the shot was fired; and still others were unsure when the gun was drawn. Mr. Peaks was later found to have been unarmed.

The testimony of the medical examiner provided support for both defense and prosecution theories of the incident. The examiner testified that the bullet entered Mr. Peaks's chest, traveled upward, and lodged in the muscles of the neck. Such a wound would result if, as defendant contended, he were falling backward as he shot, or if as the people's witnesses suggested, Mr. Peaks stumbled backward from the jabs of defendant's flashlight.

Abundant testimony was presented showing that Mr. Peaks had been drinking and appeared inebriated. In addition, it was established that Mr. Peaks weighed 175 pounds and stood 6 feet 3 inches tall; he was described by one of the women accompanying him to the theater, who had known him for several years, as being "strong as a bull". Defendant weighs 139 pounds and stands 5 feet 4 inches tall.

Defendant submits that, even absent objection, the lower court erred in instructing the jury that defendant, a private guard, was under a duty to retreat, if possible, to a safe haven when attacked on business premises. Citing *People v Lenkevich,* 394 Mich 117; 229 NW2d 298 (1975), defendant contends that his failure to object or to request a different instruction is no bar to appellate review. Without attempting to reconcile the apparent conflict between *Lenkevich* and GCR 1963, 516.2, we proceed to the merits because of the importance of the question involved.

Admittedly, a majority of jurisdictions considering the question have held with defendant that one faced with a deadly assault in his place of business may respond in kind without the necessity of first retreating to a place of safety. See, *e.g., Commonwealth v Johnston,* 438 Pa 485; 263 A2d 376; 41 ALR3d 576 (1970), *State v McNamara,* 252 Iowa 19, 104 NW2d 568 (1960), *State v Feltovic,* 110 Conn 303; 147 A 801 (1929), and cases cited in 41 ALR3d 584, § 3, pp 589–590. This rule, however, is not without its critics. See *Wilson v State,* 69 Ga 224 (1882), *Hall v Commonwealth,* 94 Ky 322; 22 SW 333 (1893), *Commonwealth v Gagne,* — Mass —; 326 NE2d 907 (1975), and *Commonwealth v Johnston, supra* at 492–494 (Pomeroy, J., dissenting).

For purposes of the present appeal, however, we need not and hence do not decide whether to expand the "no-retreat" exception to cover all persons who encounter deadly force in their places of business.[1] We approach with caution a decision to enlarge an exception that has grown but little since its original Michigan enunciation in *Pond v People,* 8 Mich 150, 177 (1860). Especially is this so where extending the "no-retreat" exception might heighten the prospect that an individual will choose to shed another's blood rather than avoid a conflict.

On the other hand, the virtue of the common law is its resilience, its willingness to yield in the face of reason and common understanding. The choice is not whether to be for or against unnecessary killing. As with most of the law, the alternatives are neither so polar nor simplistic. To hold that a security guard, assigned to protect theater

---

[1] Moreover, we express no opinion regarding the retreat issue *vis a vis* a security guard employed to protect property.

patrons, must flee to a place of safety when confronted by a deadly attack is to disregard the possibility that such a withdrawal might permit an aggressor to vent his anger on those patrons remaining in the crowded lobby.

This is not to suggest that we accept defendant's view of the confrontation. We do not. Nor do we accept the contrary versions, for the jury's verdict tells us little. It may be that the jury believed the account of defendant and his corroborative witnesses but were nonetheless compelled to convict because defendant did not retreat. Then again, the jury might have concluded that, irrespective of the duty-to-retreat issue, defendant's response to decedent's request for a salt shaker far exceeded the force required to subdue a noisy patron. In any event, given this indeterminate state of the record, there exists the significant possibility that the question of retreat was decisive. Hence, we confront it squarely.

We hold as a matter of law that under the circumstances of this case a private security guard hired to maintain order and protect business invitees has no obligation to retreat when acting in the course of his employment, but may meet deadly force with deadly force. It is incongruous to expect defendant to retire to safety when his job commands that he remain. It is illogical to demand that he flee when by so doing he, as well as his employer and the theater owner, may arguably be held civilly accountable for the havoc wreaked in his absence.[2] It is unrealistic for this Court,

---

[2] *See* 2 Restatement Torts, 2d, § 344, pp 223–224, Comment f:

"f. *Duty to police premises.* Since the possessor [of premises open to the public for business purposes] is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of

safely isolated in its appellate aerie, to enforce a rule whose practical application in the instant setting denies common sense.

The testimony adduced below manifests that noisy disturbances often necessitating police assistance were common occurrences at the Colonial, a 24-hour theater located near downtown Detroit. The defendant's job was to maintain order there within the bounds of the law. Whether in fact he exceeded those limits is for a properly instructed jury, not this Court, to decide.

We do not intend to intimate by this opinion that private security guards may now kill noisome patrons with carefree abandon. The decision to take life can only be countenanced in the most extreme and compelling circumstances. Thus, to make the defense of self-defense available, evidence on the other requisite elements must still appear. Specifically, defendant must produce evidence (a) that his own aggressive acts did not precipitate the conflict;[3] (b) that he entertained an

conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, *and to provide a reasonably sufficient number of servants to afford a reasonable protection." Id,* at 225–226. (Emphasis added.)

Similarly, *see Nash v Sears, Roebuck & Co,* 383 Mich 136; 174 NW2d 818 (1970), *Manuel v Weitzman,* 386 Mich 157, 163–164; 191 NW2d 474 (1971), *Moran v Valley Forge Drive-in Theater, Inc,* 431 Pa 432; 246 A2d 875 (1968), 29 ALR2d 911, § 2, pp 913–914.

[3] On remand, the following observation from 4 Am Jur 2d, Amusements and Exhibitions, § 9, p 120 should prove helpful to the lower court in fashioning its instruction on self-defense:

"The proprietor of a place of public amusement has a duty to maintain proper quiet and good order in and about his place during the performance and while persons are assembling and leaving. He may, where he believes a patron's conduct justifies it, request the latter to be quiet and orderly, but he must do so quietly, politely, and without unnecessarily humiliating the patron. If that is not enough,

honest belief at the time that he was in imminent danger of death or serious bodily harm; and (c) that his only recourse lay in physically repelling the attack. See *People v Bright,* 50 Mich App 401, 406; 213 NW2d 279 (1973).

That a man died because of his insistence on using a salt shaker is a tragedy we do not condone. That another man may be incarcerated for life for a crime he may not have committed is an evil equally as lamentable.

Reversed and remanded.

D. E. HOLBROOK, J., concurred.

ALLEN, P. J. *(concurring).* I concur in the deci-

he may take such additional reasonable steps as he deems necessary to end the noise or disturbance, as by summoning a police officer to act in quieting the patron, *or he may request the patron to leave, or, if it seems necessary, may use necessary and reasonable force to eject one who refuses to leave and persists in noise or disorder or in violating proper and reasonable regulations adopted to secure quiet and good order, if he exercises the right of ejection within the limitations of good order and without insult, abuse, or defamation, or, it has been said, not arbitrarily, or without just reason or cause."* (Emphasis added. Footnotes omitted.)

Hence, with regard to the element of self defense requiring that the accused be without fault or non-aggressive, defendant would be entitled, upon request, to an instruction that defendant is not the aggressor "if it seem[ed] necessary" that defendant "use *necessary and reasonable* force to eject one who refuses to leave and persists in noise or disorder". (Emphasis added.)

*Cf., People v Townes,* 391 Mich 578, 591–592; 218 NW2d 136 (1974).

Moreover, to allay confusion, it should be noted that even an aggressor may justifiably defend himself in two situations:

"(1) A nondeadly agressor *(i.e.,* one who begins an encounter, using only his fists or some nondeadly weapon) who is met with deadly force in defense may justifiably defend himself against the deadly attack. This is so because the aggressor's victim, by using deadly force against nondeadly agression, uses unlawful force. (2) So too, an agressor who in good faith effectively withdraws from any further encounter with his victim (and to make an effective withdrawal he must notify the victim, or at least take reasonable steps to notify him) is restored to his right of self-defense." LaFave & Scott, Criminal Law, p 395. (Footnotes omitted.)

Thus if the evidence warrants it, appropriate instructions should issue incorporating the foregoing qualifications.

sion to reverse because of the possibility that the jury may have felt that the defendant's failure to retreat automatically required his conviction. For the reasons so eloquently expressed by Judge RI-LEY, I agree that the law should take into account the fact that other lives may be lost if a security guard retreats in order to save his own life. Therefore, even if retreat is possible, I agree that it should not be absolutely required in all cases.

However, I am afraid that the opinion may be interpreted as establishing a rule that a security guard is entitled to stand and fight even if he could retreat without immediately jeopardizing anyone's safety.

I prefer the approach adopted by the proposed new Michigan Criminal Jury Instructions which state that a failure to retreat when retreat is possible is a circumstance which the jury may consider in determining whether the defendant was justified in using deadly force. See Michigan Criminal Jury Instructions (1975 Draft), Volume II, Chap 6, p 370.