PEOPLE v CROW

Docket No. 58351. Submitted January 5, 1983, at Grand Rapids.— Decided June 21, 1983. Leave to appeal denied, 418 Mich —.

James A. Crow was convicted of manslaughter, Berrien Circuit Court, Julian E. Hughes, J. The charge arose out of the stabbing death of a hitchhiker whom defendant had picked up and who defendant claimed had attacked him. Defendant claimed that he had acted in self-defense. On appeal, defendant alleged that the trial court erred in refusing to allow evidence of prior convictions of the victim to show the likelihood that the victim was attempting to rob the defendant. Defendant also alleged that the trial court erred by instrucitng the jury that defendant had a duty to retreat and by refusing to give an instruction that he had no duty to retreat. *Held:*

1. The material inquiry in the claim of self-defense concerns the belief of the defendant that he was in danger of being killed or receiving serious bodily harm. The actual intentions of the victim are not material or relevant to that inquiry. Thus, the trial court properly refused to allow evidence of the victim's convictions.

2. The instructions and argument as presented allowed the possibility that the jury may have felt the defendant's failure to retreat automatically required his conviction. The conviction is reversed and, on retrial, the jury should not be instructed as to the presence or absence of any legal duty to retreat but should be instructed that the possibility of a safe retreat, if the jury finds there was such a possibility, is one of the circumstances the jury may consider in determining whether defendant acted in lawful self-defense.

Reversed and remanded.

1. Hᴏᴍɪᴄɪᴅᴇ — Sᴇʟꜰ-Dᴇꜰᴇɴsᴇ — Iɴᴛᴇɴᴛɪᴏɴs ᴏꜰ Vɪᴄᴛɪᴍ.

The material inquiry in a claim of self-defense in a homicide prosecution concerns the belief of the defendant that he was in danger of being killed or of receiving serious bodily harm; the

Rᴇꜰᴇʀᴇɴᴄᴇs ꜰᴏʀ Pᴏɪɴᴛs ɪɴ Hᴇᴀᴅɴᴏᴛᴇs

[1] 40 Am Jur 2d, Homicide § 152.
[2, 3] 40 Am Jur 2d, Homicide §§ 162, 520.

actual intentions of the victim are neither material nor relevant to the inquiry concerning the defendant's belief.

2. HOMICIDE — SELF-DEFENSE — DUTY TO RETREAT.

A defendant's automobile cannot be equated with his home for purposes of instructing the jury that the defendant, when assaulted, had no duty to retreat in a case where the defendant claims self-defense in the death of a hitchhiker who defendant claims attacked him.

3. HOMICIDE — SELF-DEFENSE — DUTY TO RETREAT — JURY INSTRUCTIONS.

A defendant who claims self-defense in the homicide of a hitchhiker who defendant claims attacked him in defendant's automobile is not entitled to a jury instruction that, as a matter of law, he had no duty to retreat nor is the prosecution entitled to an instruction that, as a matter of law, the defendant had a duty to retreat; rather, the jury should be instructed that the possibility of a safe retreat, if the jury finds that there was such a possibility, is one of the circumstances for the jury to consider in determining whether the defendant acted in lawful self-defense.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Paul L. Maloney,* Prosecuting Attorney, and *Angela Baryames,* Assistant Prosecuting Attorney, for the people.

*Tat Parish,* for defendant on appeal.

Before: MacKenzie, P.J., and R. B. Burns and E. A. Quinnell,* JJ.

E. A. Quinnell, J. Defendant appeals as of right from his jury conviction of manslaughter, MCL 750.321; MSA 28.553, arising out of the August 30, 1980, death of Floyd Love.

There is no significant dispute as to the facts giving rise to the prosecution. On August 30, 1980, Floyd Love was 24 years old and described by various witnesses as being between 5′ 7″ and 5′

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

10″ in height and weighing between 160 and 180 pounds. He was a chronic drinker, and during the evening hours of that day he had been drinking wine with friends. Despite an autopsy blood test which showed a blood alcohol level of 0.36%, his friends and family members who observed him during the evening all testified that he was able to ambulate and did not appear nearly as drunk as that blood alcohol level would indicate. At about 11 p.m. he parted company with a friend and started to hitchhike the mile or less to his home. It was raining. The highway along which Love was hitchhiking was described as being either unlit or dimly lit.

The defendant, 5′ 10″ and weighing 155 pounds, also in his middle 20's at the time, was a surveying and construction inspector and an active outdoorsman. During the afternoon of the day in question he had been canoeing, and had drunk three or four cans of beer. Later that evening he had consumed two or three mixed drinks. He was driving a Capri automobile, a fairly small car, and picked up the hitchhiker Love. The two were not previously acquainted.

Defendant did not detect any odor of alcohol on Love's breath but did notice that Love was acting "strange" and made defendant nervous. Love started to look through the tapes in the console of the automobile, where defendant also kept his checkbook. On two occasions Love asked defendant to stop the car, but almost immediately would say, "No, take me up further", so defendant obliged. Love asked the defendant to stop the car a third time, which defendant did, and when Love asked the defendant to go still further defendant declined and insisted that Love leave the car. Defendant said at this time he was scared. Love insisted

to defendant that he had to go further up the road and grabbed the defendant with one hand on his neck and the other hand on defendant's upper right arm. Defendant is not sure which of Love's hands was on his neck and which on his arm. Love started screaming that defendant had to take him further, and started shaking defendant and squeezing his neck. Defendant thought Love was going to kill him and felt helpless. Defendant then reached in the front pocket of his blue jeans and pulled out a pocket knife, which he routinely carried for both work and recreational purposes, and opened it and tried to wave it in front of Love's face. Love did not respond but kept on shaking the defendant, whereupon defendant stabbed Love. The stabbing did not initially seem to affect Love, although he suddenly let go of defendant and opened the car door. Defendant testified he pushed Love out of the car as hard as he could, and that Love was standing up alongside the road as defendant drove rapidly off.

Defendant testified that he was shaking and although he had earlier planned to go to his own apartment, he did not know what to do and was confused and therefore drove to his mother's house where he was going to get a drink of water. His mother was asleep. When defendant got in the house he saw that he had some blood on his hand so he washed it off. He also vomited. He then left his mother's house.

Defendant then drove to a nearby gas station where he customarily traded and had a conversation with the attendant, Tim Weber. Weber and defendant had known each other for about four years through contacts at the gas station.

Defendant then left the gas station and went to a nearby tavern and had a conversation with a

bartender, Keith Unger. Defendant and Unger had also known each other for four or five years, through belonging to the same rod and gun club and also through contacts in the tavern. On his way home the defendant threw the knife out of his car because the knife made him sick. The following morning he contacted his attorney and later made himself available to the police.

Love's body was found about 9 a.m. on the following morning, across the road from where the altercation in the car took place. Later that day the defendant's checkbook was found on the shoulder of the road at or near the place where the altercation occurred. There were bloodstains on the checkbook of the same blood type as Love's. The autopsy indicated that Love was stabbed either four or five times, with either one or two of the wounds penetrating the heart and causing death by exsanguination, the medical examiner having found approximately two liters of blood in the pleural cavity.

The trial testimony of the defendant as summarized above was different in some respects from statements he supposedly made to Weber and Unger. Weber testified that when the defendant arrived at the gas station close to midnight, he told Weber that he had just killed a man, that he had stabbed the man 30 times in the neck, and had pushed or rolled him out of his car. According to Weber, the defendant said he could see the man was not breathing. He mentioned nothing about any choking. Weber did concede that he thought the defendant was joking and did not believe that any such episode had occurred.

Unger said that the defendant came into the tavern obviously in some distress, and Unger asked the defendant what was wrong. The defen-

dant, speaking privately to Unger, claimed that the hitchhiker would not get out of his car, tried to steal from him, and grabbed him around the neck. According to Unger, the defendant said he pushed the hitchhiker out of his car and when the hitchhiker tried to get back in the defendant stabbed him. Unger also did not believe that any such episode had occurred.

Defendant testified that he told both Weber and Unger essentially, although briefly, the same version that he gave at trial, and also said that it was obvious that neither Weber nor Unger was taking him seriously.

The case was submitted to the jury on the charge of second-degree murder and the lesser included charge of manslaughter. The defendant's claim of self-defense was also presented to the jury. The jury obviously rejected the self-defense argument but did find the defendant guilty only of manslaughter.

## I

Defendant claims the trial court erred in refusing to allow the defense to prove that Love had previously been convicted of two misdemeanor larceny offenses. The offer of proof was made under MRE 404(b), which provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crime, wrongs, or acts are contemporaneous with, or prior or subsequent to the crime charged."

The defense theory was that the proffered evidence increased the likelihood or probability that Love was attempting to steal or rob from the defendant, rather than merely acting like a clumsy drunk.

The trial court correctly ruled that the offered evidence was not material. In the context of a claim of self-defense, the material inquiry concerns the belief of the defendant that he was in danger of being killed or receiving serious bodily harm.[1] The actual intentions of Love were not material, nor were those intentions relevant to the only material inquiry, *i.e.,* the defendant's belief. There was no error in the ruling.

## II

Defendant further claims that the trial court committed error by instructing the jury that the defendant had a duty to retreat and by refusing to give a requested instruction that the defendant had no duty to retreat. This is a much more troublesome claim.

## A

It was the position of the prosecutor during final argument that, even if all of defendant's factual assertions regarding the events in the automobile were accepted as true, the defense of self-defense was not available either because (1) defendant used excessive force in repelling Love's attack, or (2) defendant did not observe his duty to retreat. The trial court charged the jury on self-defense and the amount of force which can be used, pursuant to CJI 7:9:01, and there is no claim of error in that regard.

---

[1] We need not here decide whether the belief must be honest, or both honest and reasonable; see *People v Robinson,* 79 Mich App 145; 261 NW2d 544 (1977).

Over the objection of defense counsel, the trial court charged the jury as to the defendant's duty to retreat, pursuant to CJI 7:9:02, as follows:

"The law requires a person to avoid using deadly force if he can safely do so. If the defendant could have safely retreated, but did not do so, his failure to retreat is a circumstance which you may consider, together with all the evidence in determining whether he went further in repelling the danger than he was justified in doing.

"However, if the defendant believed that he was in eminent *[sic]* danger of death or serious bodily harm and that deadly force was immediately necessary to repell *[sic]* such danger, he was not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and use such force as he believed immediately necessary to protect his person."

These first words of the court regarding a duty to retreat were preceded by a closing argument by the prosecutor, otherwise impeccably moderate, in which the prosecutor consistently misstated the duty to retreat by making it appear to be an absolute duty. In chronological sequence, the prosecutor's references to the duty to retreat are as follows:

"and I say that because even if things are as James Crow says they were, I suggest to you that before a person is justified or excused from taking the life of another person, there must be no conceivable way that he can retreat, no way to retreat, and I suggest to you in this case that the evidence has shown that there was in fact a way for James Crow to retreat, even if you believe that Floyd Love was in his car, was drunk, was fooling with his tapes, that he was excited, that the defendant was excited, that Floyd Love wouldn't get out of his car, that he grabbed him around the neck, that there was an opportunity for James Crow to escape, and it was his duty to do that.

* * *

"James Crow sat on the witness stand and said that he couldn't retreat because he was being choked and held by Floyd Love. Again, he is unarmed, Floyd Love, same size and in a drunken condition.

"Now, that becomes crucial. He said he can't retreat. I asked him why, how was he holding him. Well, he couldn't really remember exactly how he was being held. The testimony was that he had one hand around his neck and one hand on his arm holding his arm. The deceased, Floyd Love, had one hand on James Crow's neck and one hand on the arm. So I asked James Crow, okay, I am being Floyd Love, you be James Crow. How was he holding you. Well, I can't remember. He can't remember how he was holding him. He was holding you so strong that you couldn't get out of the car? But what was he able to do? No, he is being held there, feet are on the pedals with a pair of jeans. You know how jeans fit. In his own car being held, he is able to—now, unless Floyd Love held him with his left hand. Picture a seat, you can do it in the jury room as well as I am doing it, there's more body to do it with. Unless he is holding him with his left hand by the neck, then according to the testimony of James Crow, Love's right hand should be on his neck and his right hand out to be on Crow's right arm. Now, true, we are creating this because James Crow doesn't remember, but how else could it happen?

"Now, he can't retreat. What's he able to do? This guy is so overpowering, yet he is able to reach in the pants of his blue jeans while seated, pull out his knife, open the knife—and I am not even going to try because I don't think I know how to open this knife, it's not the easiest knife in the world, at least for me to get open— pull out the knife, open the knife. He admitted it took two hands to open the knife. How is he being held? By the arm and by the neck. To be able to put your hand in, take it out, open it. Then he said he even waved it and he wouldn't get out and he had to take it and stab him. He didn't remember how he stabbed him when he came across. We know how the wounds went, right to left or down. He didn't remember that. But he was able

to inflict five wounds upon Floyd Love, never getting a mark himself. He didn't have any trouble doing that.

"It was his testimony that he did all that with both his left foot on the clutch and the right foot on the brake. That's why we are here. You have seen what James Crow told you. You can believe it if you want that Floyd Love put his hand on James Crow's neck, but I submit to you that the evidence shows that he could still have gotten away. He could have retreated or he could have fought him off without the use of the weapon. He could have inflicted a non-deadly blow.

\* \* \*

"Again, there's a duty to retreat if in fact Floyd Love is stabbed and not attacking. There's a duty to get out of the car and be away before you deliver the finishing blows.

\* \* \*

"But that he still could have retreated, never used the knife, fought the guy off—fought Floyd Love off—or even inflicted a non-deadly wound that would lessen this from murder to manslaughter. He is excited, but still could have done that.

\* \* \*

"Then we got James Crow himself, which is evidence which you must consider in his version, and I suggest to you that this version that he told you, if you accept it, even if you believe that Floyd Love did grab him, that his actions still amount to either murder or manslaughter, because, A, he could have retreated, or B, he used too much force."

The jury in this case might well have rejected the defendant's claim of self-defense because it found the prosecution had proved beyond a reasonable doubt that the defendant used excessive force in repelling the attack. Nonetheless, because of the foregoing argument and instruction, we share the concern expressed by Judge ALLEN, concurring in *People v Joeseype Johnson,* 75 Mich App 337, 345; 254 NW2d 667 (1977), that there was a "possibility

that the jury may have felt that the defendant's failure to retreat automatically required his conviction".

## B

CJI 7:9:03 provides:

"A person who is assaulted while in his own house [dwelling] is under no obligation to try to escape, but may stand his ground and repel the attack with as much force as appears necessary for the defense of his person."

The defendant requested a modified version of this instruction, to the effect that he had no duty to retreat from his own automobile. The trial court properly refused to give this instruction, because the defendant's car cannot be equated with his home under the circumstances of this case.

According to the case law of many jurisdictions, modifying the common law, defendant would have been entitled to an instruction that if he honestly and reasonably believed he faced death or great bodily harm, he had no duty to retreat before resisting his adversary with deadly force. See, *e.g., State v Jackson,* 94 Ariz 117; 382 P2d 229 (1963); *People v Bush,* 414 Ill 441; 111 NE2d 326 (1953); *State v Hiatt,* 187 Wash 226; 60 P2d 71 (1936); *State v Merk,* 53 Mont 454; 164 P 655 (1917); *Miller v State,* 139 Wis 57; 119 NW 850 (1909).

The early case law in this state reaches a similar result. In *Pond v People,* 8 Mich 150 (1860), Justice CAMPBELL set forth the common-law distinctions between justifiable homicides and excusable homicides. Justifiable homicides were those that occurred while a defendant was attempting to prevent a felonious attack, either against himself

or against another. In such cases, there was no duty to retreat. See *People v Macard,* 73 Mich 15; 40 NW 784 (1888). An excusable homicide is one which occurred in a sudden affray or in repelling an attack not made with a felonious design. According to Justice Campbell the rationale was that,

"it was excusable and not justifiable, because, occurring in a quarrel, it generally assumed some fault on both sides * * *. In these cases, the original assault not being with a felonious intent, and the danger arising in the heat of blood on one or both sides, the homicide is not excused unless the slayer does all which is reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe, or by any other expedient which is attainable." *Pond v People, supra,* pp 175-176.

Thus, accepting defendant's uncontroverted version as to the unprovoked attack by Love, and laying aside the question of excessive force, the defendant's killing of Love would have been considered justifiable under early Michigan law, and there would have been no obligation on his part to retreat or escape.

The common-law distinctions have since become blurred or have been ignored. See for instance the Model Penal Code, § 3.04, which provides generally that the use of deadly force is not justifiable if the actor can retreat with complete safety, unless he is in his dwelling or place of work. The code does not recognize the common-law distinction between justifiable and excusable homicides.

Thus, although the defendant was not entitled to an instruction informing the jury that, as a matter of law, he had no duty to retreat, we are equally satisfied that the prosecution was not entitled to

an instruction to the jury that, as a matter of law, the defendant had a duty to retreat, given the circumstances of this case.

We agree with the majority notation in *Joeseype Johnson, supra,* p 341, that,

"the virtue of the common law is its resilience, its willingness to yield in the face of reason and common understanding. The choice is not whether to be for or against unnecessary killing. As with most of the law, the alternatives are neither so polar nor simplistic."

Unless the prosecution has shown beyond a reasonable doubt that the defendant is not to be believed, imposing on him an obligation to retreat or escape in the circumstances of this case is simply not consonant with common experience. Requiring as a rigid rule of law that a person in defendant's circumstances abandon what sanctuary he possesses in his automobile, and indeed the automobile itself, to flee into a wet, dark, semi-rural countryside, would be to require such a person to make a Hobson's choice under very stressful circumstances. The law does not require such conduct.

Rather, we agree with the observation of the United States Supreme Court in *Brown v United States,* 256 US 335, 343; 41 S Ct 501; 65 L Ed 961 (1921):

"Concrete cases or illustrations stated in the early law in conditions very different from the present, like the reference to retreat in Coke, Third Inst 55, and elsewhere, have had a tendency to ossify into specific rules without much regard for reason. * * * Rationally, the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt."

CJI 7:9:01 instructs the jury as to appropriate considerations to use in determining whether the defendant was acting in lawful self-defense, and the ability to safely retreat can easily be injected in either of two places: (1) the defendant's fear of receiving serious bodily harm or death, or (2) the defendant's perception of the immediate need for the use of deadly force, and the alternatives that were available to him.

Accordingly, we reverse and remand. On retrial, the jury should not be given any instruction as to the presence or absence of any legal duty to retreat but should be informed that the possibility of a safe retreat, if the jury finds that there was such a possibility, is one of the circumstances which the jury could consider in determining whether the defendant acted in lawful self-defense.

Reversed and remanded.