# IN THE COURT OF APPEALS OF IOWA

No. 14-1409
Filed August 5, 2015

**ROBERT MACLAIRD,**
　　　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　　　Respondent-Appellee.

_____

　　　　Appeal from the Iowa District Court for Warren County, Gregory A. Hulse,

Judge.

　　　　Robert MacLaird appeals from the denial of his application for

postconviction relief. **AFFIRMED.**

　　　　Amanda Demichelis of Demichelis Law Firm, P.C., Chariton, for appellant.

　　　　Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney

General, John Criswell, County Attorney, and Douglas Eicholz, Assistant County

Attorney, for appellee State.

　　　　Considered by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DANILSON, C.J.**

Robert MacLaird appeals from the denial of his application for postconviction relief. Because MacLaird failed to prove the requisite prejudice, his claims of ineffective assistance of trial and appellate counsel fail. We affirm.

## I. Background Facts and Proceedings.

*Criminal trial.* We have previously stated the facts leading to MacLaird's conviction:

> On August 7, 2007, while his wife, Cheryl MacLaird, was at work, Robert MacLaird (MacLaird) and his girlfriend, Diana Graham, went to the home of MacLaird's friend Dennis Holt in Beech, Iowa. Although Holt lived only a few houses away from MacLaird, they drove to Holt's house. MacLaird and Graham assisted Holt in counting cans to take to the redemption center. The three then left in Holt's vehicle to drive to Indianola, where they redeemed the cans, and then bought beer at a Hy–Vee Store. MacLaird, Graham, and Holt all drank the beer as they drove through Warren County.
>
> After they returned to Holt's house, Holt suggested they go swimming at a nearby pond. MacLaird returned to his house to get some shorts. The three then drove to Pleasantville to get more beer, before going to the swimming pond. They agreed to go swimming in their underwear. After Holt made a comment noticing that Graham's panties were transparent when wet, Graham and MacLaird exchanged underwear. They spent several hours swimming and drinking.
>
> Eventually a thunderstorm broke out. MacLaird became impatient because Graham waited for Holt before getting out of the water. Graham stated MacLaird threw her clothes at her, and a bottle that was in them hit her on the head. MacLaird was unable to find his shorts before they left. As they stopped at Holt's house, MacLaird got out of the car and walked home, wearing only Graham's panties. Graham went into Holt's home.
>
> Cheryl let MacLaird into their home. He changed into dry clothes and told Cheryl "they wouldn't let him have his belongings" and stated he wanted to call the state patrol. MacLaird asked Cheryl to drive him to Holt's house so he could get his keys, cell phone, and car. Cheryl testified, "It could be assumed he was angry, yes." She described MacLaird as "Frustrated. Agitated." . . . MacLaird took a black powder revolver, a modern replica of an antique gun, with him.

MacLaird knocked on Holt's door, and Holt answered the door carrying an eight-inch survival knife. MacLaird repeatedly asked for his car keys and cell phone, and Holt kept telling him to go home. Cheryl got out of the car and came up to Holt's porch as Holt came out of the door. Holt raised up the knife, and told Cheryl "get your old man out of here." Cheryl said, "I'll get Bob out of here," and began trying to reason with him. In the meantime, MacLaird had obtained the revolver from Cheryl's car. MacLaird shot the revolver. [The percussion cap, used to ignite the powder used in the revolver, "went off," but the powder did not ignite and discharge the bullet that was in the cylinder. According to MacLaird's testimony, he had in the past regularly used the black-powder revolver for recreational shooting. He further testified, however, that when shooting the revolver in 1994 the percussion cap on the one cylinder that remained loaded with powder and a bullet "went off" but the revolver did not fire, he replaced the cap, and he had not subsequently shot the revolver.]

Holt said, "I can't believe you just did that." MacLaird replied that he would not shoot Holt. Holt came up to MacLaird and put the knife to his throat. MacLaird struck Holt on the head with the heavy revolver about three to five times. Cheryl told MacLaird to stop, and he did. Holt fell to the ground, bleeding profusely from the head. Graham came out of Holt's house as he lay on the ground. Graham attempted to assist Holt. MacLaird came over and said, "Get away from him. He's my friend." Graham yelled at MacLaird. Cheryl told him his keys were in his car. MacLaird got in his car and drove home. Cheryl called 911.

After law enforcement officials and paramedics arrived, MacLaird returned from his home to turn himself in. MacLaird told a deputy sheriff he had gone to Holt's house "to confront Diana and Dennis about what they were doing, about how it wasn't right, and he wanted to run away with Diana and make a new life." Officers found MacLaird's cell phone in his car. Holt died of blunt-force injuries to the head.

MacLaird was charged with murder in the first degree, willful injury resulting in serious injury, and burglary in the first degree. MacLaird filed notice of his intent to rely on the defense of self-defense, or justification, at trial. MacLaird testified that he shot the revolver at the ground, and he was hoping to scare Holt off. He said Holt threatened to slit his gullet like a fish, and that he pushed the knife at his throat. MacLaird stated he thought Holt was killing him, and he hit Holt with the revolver. MacLaird sustained no injuries in the incident.

*State v. MacLaird*, No. 08-1559, 2009 WL 2960408, at *1-2 (Iowa Ct. App. Sept. 2, 2009). MacLaird was convicted of second-degree murder.

*Direct appeal.* On direct appeal from his conviction, MacLaird claimed his trial counsel were ineffective in failing to move for judgment of acquittal on grounds there was insufficient evidence to establish he acted without justification. This court rejected that claim, ruling:

> MacLaird initiated the incident by going to Holt's home while he was angry and bringing a loaded revolver with him. He was asked multiple times to leave by Holt and Cheryl, but continued to demand the return of his car keys and cell phone. MacLaird had an alternative course of action available to him in that he could have retreated or left the area at any time during this discussion. Instead he continued the incident by returning to Cheryl's car to get the revolver he brought to Holt's home. MacLaird admitted that as he came forward with the revolver he pulled it up to show Holt, and Holt "went to head towards—in the house." Thus, as Holt was retreating, MacLaird further escalated the incident by shooting the revolver.
> We conclude that even if defense counsel had argued in the motion for judgment of acquittal that there was insufficient evidence to establish that he had acted without justification, the district court would have denied the motion because the State presented sufficient evidence to show that the defendant acted without justification.

*Id.* at *3. We also rejected another claim of constitutionally-defective counsel on direct appeal, which was grounded on MacLaird's contention there was insufficient evidence of malice aforethought. *See id.* at *4. We noted, "MacLaird brought a loaded revolver to Holt's home, which permits a presumption of malice aforethought. *Id.* We affirmed his conviction for second-degree murder, and the supreme court denied further review on October 30, 2009.

*Postconviction application.* MacLaird then filed his present application for postconviction relief in which he asserts trial and appellate counsel were ineffective in numerous respects.

Upon trial on the application, the deposition testimony of criminal trial attorney Marc Elcock and of appellate attorney David Adams was admitted into evidence. MacLaird's lead counsel at trial, D. William Thomas, testified. MacLaird testified as well. The district court filed an extensive written ruling, addressing each of MacLaird's twenty claims of ineffective assistance of counsel and rejecting several. However, the postconviction court found Thomas should have filed a motion in limine; should have cross-examined Warren County Deputy Tim Cook; should have objected to irrelevant and prejudicial evidence of drug paraphernalia and photographs of digital scales; should have objected to the admissibility of nude photographs of Graham (though acknowledging whether prejudicial effect outweighed relevance was for the court to decide); and failed to timely object to Cheryl's testimony that when MacLaird drank too much, he became violent. Nonetheless, the postconviction court determined that despite these deficiencies of counsel's performance, MacLaird failed to establish the prejudice necessary to prove a claim of ineffective assistance of counsel.

MacLaird appeals, contending the postconviction court erred in finding overwhelming evidence of guilt. He asserts counsel was ineffective in other respects, and the cumulative failures require a new trial.

**II. Scope and Standard of Review.**

Because ineffective-assistance-of-counsel claims are grounded in the Sixth Amendment to the United States Constitution, our review is de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

## III. Discussion.

> Ineffective assistance of counsel constitutes deficient performance by counsel resulting in prejudice, with performance being measured against an objective standard of reasonableness, under prevailing professional norms. Not every claim of ineffective assistance, even a meritorious one, requires reversal of a criminal conviction. To prevail on a claim of ineffective assistance of counsel, a claimant must satisfy the *Strickland* test by showing (1) counsel failed to perform an essential duty; and (2) prejudice resulted. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 494-95 (alterations, citations, and internal quotation marks omitted).

"Prejudice exists where the claimant proves by a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496 (citations and internal quotation marks omitted). We must determine whether MacLaird has shown "that the probability of a different result is sufficient to undermine confidence in the outcome." *Id.*

Here, the postconviction court determined MacLaird did not and could not establish the requisite prejudice because there was overwhelming evidence that MacLaird did not act with justification. As noted by the postconviction court, the State can meet its burden to prove the defendant acted without justification by proving one of the following: (1) the defendant started or continued the incident which resulted in injury; (2) an alternative course of action was available to the defendant; (3) the defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save the defendant; (4) the defendant did not have reasonable grounds for the belief; or (5) the force used by the defendant was unreasonable. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). The postconviction court found the evidence

not only sufficient but overwhelming that [MacLaird] went [to Holt's] to do physical harm to the victim. The evidence is uncontested that [MacLaird] went to Holt's house with the gun. It is also uncontested that he had numerous chances to leave the premises and that he had shot his gun thus provoking Holt to brandish the knife.

We agree. Iowa law allows the presumption that a person who uses a deadly weapon acts with malice aforethought. *State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003). The presumption may be rebutted by evidence the killing was accidental or under provocation. *Id.; see also State v. McNamara*, 104 N.W.2d 568, 572 (Iowa 1960) (holding that presumption of malice aforethought arises from the use of a deadly weapon "unless there is an explanation to the contrary showing a legal excuse such as self-defense"). MacLaird's testimony at trial did not convince the jury the killing was justified, and his additional testimony at postconviction does not convince us otherwise:

> Q. Besides yourself, and her testimony is that you struck Mr. Holt three times? A. That's the truth. After three times, he fell down, and I dropped the gun and I got on my knees, and I held his head up. I said, "I'm sorry, Holt. I didn't mean to hurt you." It was just instantaneous.
> Q. And why was it instantaneous? A. Once I felt that knife on my throat, I didn't even have a chance to think. It was just instant. I just brought the gun up and swung until he fell down. It was just that quick, just a few seconds.
> Q. And because you had the knife to your throat and because you only struck him three times, that was why you filed your notice of self-defense, right? A. That's correct.
> . . . .
> Q. Your theory was that you simply grabbed it [the gun] to be able to defend yourself because you wanted to get your stuff back, your personal items back? A. Plus at the time [months prior] I had words with him, I walked up to his driveway holding hands with Diana Graham, and he had a pick handle and he proceeded to beat me with it and broke my ribs. We had words at the pond that night. Actually, when I went home, somebody pulled up in the driveway and since I was so drunk, I couldn't find my clothes when we got out of the pond; I went home in my underwear. When I got dressed I was thinking, if he's standing in the driveway again with that pick

handle, maybe I should have something to show him so he won't do anything. So I threw it in my wife's car. When I went to the door and knocked, I never took it up to the door. It wasn't until he came out with the knife and threatened me several times and then he had the knife and was shaking it at my wife telling me what he was going to do when I reached in and grabbed the gun. That was just to scare him off, because after I pointed it at the ground and pulled the trigger, he asked—he ran inside the house. He was in the house. He asked, "Bob, did you try to cap me?" I said, "No, Denny, the gun is not loaded. I won't try to hurt you." Then he came back outside and grabbed me around the collar and put the knife to my throat.

MacLaird's own testimony shows beyond a doubt that he had an alternative course of action available—he could have left, which Holt repeatedly told him to do *before* MacLaird retrieved the gun. And the asserted provocation upon which MacLaird relies—Holt's use of the knife—occurred only after MacLaird brandished the gun. Consequently, assuming without deciding that counsel's performance was deficient in some respects, we cannot conclude there is a reasonable probability that the result of the proceeding would have been different had those deficiencies not occurred.

The postconviction court carefully considered all of MacLaird's claims. The court wrote an exhaustive and thoughtful ruling. On our de novo review, we reach the same conclusion as the district court and deny the application for postconviction relief. Additional discussion is not necessary. We therefore affirm without further opinion.

**AFFIRMED.**