# IN THE COURT OF APPEALS OF IOWA

No. 23-1372
Filed October 2, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DIMARI DIAJAE JAISHON MEREDITH,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Lee (North) County, Joshua P. Schier, Judge.

A criminal defendant appeals his second-degree murder conviction. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

Dimari Meredith appeals his conviction and sentence for second-degree murder. He raises issues concerning a motion for continuance related to a jury-composition claim, sufficiency of the evidence, and his sentence. We affirm, finding no abuse of discretion in denying the requested continuance, the verdict was supported by sufficient evidence, and the sentence complied with our case law for sentencing juvenile murderers to a mandatory minimum.

## I.      Background Facts and Proceedings

Seventeen-year-old Meredith was hanging out with his fifteen-year-old friend D.C. at D.C.'s grandmother's home in Fort Madison. There were no overt signs of disagreement between the two, who were in D.C.'s room. D.C.'s grandmother, uncle, and brother were relaxing elsewhere in the house when they heard a loud noise—which they soon realized was a gunshot.

When D.C.'s grandmother got to the bedroom, she found D.C. "slumped over at the foot of his bed" and Meredith "sitting on the couch" nearby. She screamed: "Call 911, call 911, he shot [D.C.], he shot [D.C.]." And she pressed a towel against D.C.'s neck to try to stop the bleeding while she waited for help to arrive. But it was too late: a bullet was lodged in D.C.'s brain, and he died.

Shortly after police responded and attempted to render aid, D.C.'s older brother, uncle, and an officer watched as Meredith "jetted out of the front door" and took off running down the street. Another officer, still in his squad car, saw Meredith fleeing and stopped him. The officer asked Meredith if he was involved in the incident down the block, and Meredith said no—he was "just out for a run."

Officers placed Meredith in a squad car, but—in one officer's words—"ironically, that was a brand new vehicle and the child locks in the back were not activated to be locked." Meredith twice opened the door and attempted to flee: once wearing clothes and once wearing only his underwear. Police re-apprehended him both times. Officers read Meredith *Miranda* warnings, and he said that he did not know what was going on, that he was sleeping when the gun went off, and that he "did not know anybody inside the house." He also told officers that, if they tested his clothes and body for gunshot residue, they would not find any. A preliminary gunshot-residue test on Meredith's hands was positive. And while he had initially given police his true name, Meredith tried to give a false name to officers later in the day.

Back at the house, in D.C.'s room officers found a 9mm pistol inside a box and a spent casing on the couch where Meredith was sitting. Testing by a firearms expert with the Division of Criminal Investigation confirmed the pistol fired the casing from the couch and the bullet later recovered from D.C.'s brain. The firearms expert also explained at trial that this pistol would not "just go off" accidentally, as it had multiple safeties and a "double-action trigger" that required a "long, heavy trigger pull in order to fire the gun."

An autopsy determined the cause of D.C.'s death was a gunshot wound to the back of the neck, shot from "indeterminate range"—not point blank. The medical examiner ruled the manner of death homicide, meaning someone other than D.C. "fired the gun that shot the bullet that killed [him]." The pathologist ruled out suicide because it is "impossible" for someone to point a gun to the back of their own neck and fire it while leaving an indeterminate-range wound.

Although D.C.'s grandmother and others inside the house did not overhear any discord between Meredith and D.C. the day of the shooting, one of D.C. and Meredith's shared friends testified she gave them a ride earlier in the day and something seemed off. According to the friend, Meredith "didn't seem as talkative" or "happy as usual." She thought he "looked angry." And she observed D.C. was not acting "happy, goofy, smiling, laughing" like he usually did. Both were quiet when she dropped them off.

Meredith testified at trial that D.C. was his "best friend." He said they were "playing around with the gun" and it accidentally went off in his hand. He explained he did not intend to shoot D.C., but acknowledged he must have pulled the trigger. He admitted he "lied" to police—by falsely claiming he was asleep, that D.C. killed himself, and that he and D.C. weren't friends. And he admitted that he never told the police the story he told the jury about the gun accidentally going off in his hand.

The Lee County Attorney charged Meredith with first-degree murder, and Meredith unsuccessfully sought reverse-waiver transfer to juvenile court. The Attorney General's Office then appeared due to a potential conflict in the county attorney's office and amended the charge to murder in the second degree, a class "B" felony in violation of Iowa Code sections 707.1 and 707.3 (2021). A North Lee County jury found Meredith guilty on the amended charge following trial. He appeals.

II.    Discussion

Meredith raises three claims on appeal: that the district court abused its discretion in denying a continuance related to his jury-composition challenge, that

there was insufficient evidence, and that the court abused its discretion in applying the constitutional juvenile-sentencing factors. We address each in turn.

## A. Jury-Composition Continuance

Meredith first seeks relief on a denied motion for continuance arising in the context of a jury-composition claim. The backdrop is our supreme court's decision in *State v. Plain*, where the court formally adopted the U.S. Supreme Court's three-part test for fair-cross-section claims, requiring a defendant to prove:

(1) that the group alleged to be excluded is a "distinctive" group in the community;
(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

898 N.W.2d 801, 821–22 (Iowa 2017) (formatted for readability) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

Meredith frames the issue on appeal as whether the district court should have granted a continuance so he could put forward an expert to allegedly address prong three—a question we review for an abuse of discretion. The State asserts our review is de novo, but we think the State's position conflates the underlying merits of a fair-cross-section challenge with the narrower question regarding the continuance. Consistent with Meredith's briefing and the case law, we review for an abuse of discretion. *See State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012). But we note, in any event, we would come to the same conclusion and affirm under either standard.

The afternoon before trial began, Meredith filed a "motion to strike jury pool [and] jury panel,"[1] urging a fair cross-section problem in the panel's makeup because it only included one person of mixed or African American race. The court heard oral argument on the motion the next morning while potential jurors waited in the next room. Meredith asked for a continuance "for a day or two to allow us to arrange expert witness testimony on the third prong of [the *Plain*] test." Meredith's lawyer said he just had a hearing in South Lee County on the same issue, and there was "no difference in this issue in regard to North Lee County and South Lee County." The State resisted the last-minute continuance and argued on the merits that Meredith's "bare bones" motion "doesn't even allege prong three, which is . . . systematic exclusion." The State also asserted, and Meredith's lawyer did not disagree, that jury questionnaires supplying the panel's racial composition had been available at the final pretrial conference held eleven days earlier. The transcript of that pretrial conference also documents Meredith's counsel informing the court he was aware there could be "an issue of jury makeup." The court denied the continuance, observing Meredith "hasn't even addressed the third prong let alone met that third prong," noting there was "no evidence presented at all that there is any kind of systematic exclusion," and recognizing the Iowa supreme court had held the process for selecting and drawing jurors in North Lee County was

---

[1] Terminology in these cases—pool, panel, venire, petit jury, etc.—is a bugaboo or source of confusion. *See State v. Ford*, 992 N.W.2d 641, 642 nn.1–4 (Iowa Ct. App. 2023). Looking beyond terminology in the pleading to the substance, we understand Meredith's motion to contest the jurors who reported to the courthouse for service in his case, which we refer to as the "panel." *See id.* n.3.

constitutional earlier that year. *See State v. Lilly*, 969 N.W.2d 794, 799–800 (Iowa 2022).

The core of Meredith's claim is that the district court denying his requested continuance "foreclosed presentation of evidence" regarding the third *Plain* prong. The State offers two responses: first, that Meredith could have had that evidence ready to present if it existed (so his lack of preparedness did not justify a continuance); and second, that Meredith did not allege systematic exclusion, meaning his claim was facially deficient (and thus a continuance would not have remedied the deficiency).

We see no abuse of discretion in the district court's ruling denying the continuance. The afternoon-before-trial motion was accurately described as "bare bones." And we agree with the district court that Meredith did not plead or orally make any allegation on prong three concerning systematic exclusion. We also recognize this all unfolded in a hearing the morning of trial, with potential jurors waiting in the next room and a schedule dictated by Meredith's demand for speedy trial that left little room for delay. And we note Meredith offered no excuse below for apparently having access to information on the panel a week and a half before trial but only making his motion ten days later, roughly eighteen hours before jury selection. If Meredith truthfully had an expert prepared and willing to testify on this issue, Meredith should have been ready to present that evidence without a multi-day continuance. Under these particular circumstances, we cannot say the district court abused its discretion when it denied Meredith's requested continuance.

And we think this case is different from those cases in which we have ordered a limited remand. In *State v. Armsted*, the defendant requested a

"significant recess" to have the county "run [jury-composition] numbers." No. 19-1883, 2021 WL 1016575, at *5 (Iowa Ct. App. Mar. 17, 2021). Similarly, in *State v. Buchanan*, the defendant requested a continuance to conduct "discovery on the method of how these prospective jurors were selected for this panel." No. 17-1713, 2018 WL 6120044, at *1 (Iowa Ct. App. Nov. 21, 2018). According to Meredith's own counsel, he did not need a continuance to run numbers or conduct discovery because he already had all that information—he just, for whatever unstated reason, did not have his expert witness ready to testify even though he knew or should have known he would make a jury-composition challenge. And, while the defendants in *Armsted* and *Buchanan* needed to seek information from state employees with the judicial branch, Meredith did not; the unavailability of evidence was a problem of Meredith's own making, not the prosecution's or the court's.

Last, it is hardly a novel idea that Meredith needed to be prepared to make this showing:

> If defense counsel waits until the morning of the day of trial to determine whether there is a fair cross-section issue, it will almost always be too late to do the necessary discovery and be prepared to make an informed presentation. As a result, defense counsel must prepare the merits of the fair cross-section claim as to the aggregate date *before* seeing the jury panel in their client's case.

Russell E. Lovell, II & David S. Walker, *Achieving Fair Cross-Sections on Iowa Juries in the Post*-Plain *World: The* Lilly-Veal-Williams *Trilogy*, 68 Drake L. Rev. 499, 534 (2020) (footnote omitted); *see also Armsted*, 2021 WL 1016575, at*8 & n.9 (Greer, J., specially concurring) (citing the Lovell and Walker article and reflecting that "'boots on the ground'—trial judges and the lawyers" need to be

prepared to litigate these claims). In sum, we conclude Meredith cannot complain he was entitled to a continuance when the very reason for the continuance was entirely within his control.

Finally, to the extent any merits question on the underlying motion to strike the panel is before us, we would affirm the district court. The district court accepted as an exhibit the district court ruling in the *Lilly* remand, and Meredith does not challenge the admission of that exhibit on appeal, nor did he offer any differing numbers below. The exhibit established that no more than 0.461% to 0.832% of eligible North Lee jurors were African American. Meredith's counsel identified one African American juror out of 108 potential jurors reporting for trial—amounting to 0.93% of the panel, which establishes slight over-representation of African Americans based on the available record evidence, not under-representation. This supplies an independent basis to affirm the district court, as this prong-two argument was advanced by the State below. And if nothing else, it establishes harmless error on Meredith's continuance claim, as it does not matter what evidence he could have established on prong three once he failed to prove prong two, and he never claimed the expert had anything to offer on the second prong.

### B. Sufficiency of the Evidence

Meredith next challenges whether there was sufficient evidence he acted voluntarily and "with malice aforethought either express or implied." Iowa Code § 707.1. "We review sufficiency-of-evidence claims for correction of errors at law." *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (quoting *State v. Jones*, 967 N.W.2d 336, 339

(Iowa 2021)). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Jones*, 967 N.W.2d at 339 (citation omitted).

Meredith's jury received the model instruction for malice, which provides as follows:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.
> Malice aforethought may be inferred from the defendant's use of a dangerous weapon.
> Although motive is not a necessary element of murder, lack of motive may be considered in determining whether the Defendant acted with malice aforethought.
> Because this element is a state of mind, circumstantial evidence is generally used to prove malice.

The jury was also instructed that,

> To commit a crime, a person must intend to do an act which is against the law. While it is not necessary that a person knows the act is against the law, it is necessary that the person was aware he was doing the act and he did it voluntarily, not by mistake or accident. You may, but are not required to, conclude a person intends the natural results of his acts.

These instructions were not objected to at trial and are therefore the law of the case. *E.g.*, *State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020).

The main thrust of Meredith's argument is that he testified the shooting was accidental, and some evidence supports that version of events. The problem for Meredith is that the jury was not required to accept any or all of his testimony as true. *See State v. Davis*, 988 N.W.2d 458, 469 (Iowa Ct. App. 2022). And we conclude the jury here rationally could—and did—rely on other evidence sufficient to establish he shot D.C. voluntarily—rather than accidentally—and with malice.

Perhaps most importantly, the jury was correctly instructed that it could infer malice from Meredith's use of the gun. *See State v. Green*, 896 N.W.2d 770, 779–81 (Iowa 2017) (tracing the history of this permissive inference and re-affirming its use). In his brief, Meredith contests whether he "used" the firearm such that he triggered the permissive inference supporting malice aforethought. Assuming without deciding this is a sufficiency challenge exempted from our error-preservation rules, rather than a different legal challenge that had to be preserved, we are not persuaded. Again, the jury could have rejected Meredith's testimony and concluded he voluntarily or intentionally fired the weapon, particularly given the firearms expert's unrebutted testimony regarding the safeties and the "double-action trigger" that required a "long, heavy trigger pull in order to fire the gun." A reasonable jury could also consider Meredith's actions after the shooting—pretending to be asleep, putting the gun back in the box, fleeing the scene, and lying to police—as substantive evidence of guilt inconsistent with accidental discharge. *See, e.g.*, *State v. Turner*, 630 N.W.2d 601, 609 (Iowa 2001) ("[C]onflicting statements about who did own the gun were another indication of guilt."); *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Admissions may be implied by the conduct of the defendant subsequent to a crime when such conduct

indicates a consciousness of guilt."); *State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt . . . ."). What Meredith really asks us to do is substitute his preferred view of the evidence for the jury's—and we are not empowered to do that on appeal.

Last on this issue, Meredith points toward the absence of any clear motive for the shooting. Motive, of course, is not a required element of murder—though it is frequently probative on mens rea, and a jury may consider its absence in assessing malice. *State v. McNamara*, 104 N.W.2d 568, 572 (Iowa 1960). In their briefs, Meredith and the State spar over how to characterize D.C. and Meredith's interactions in the car the day of the shooting, as recounted by their mutual friend. The State contends there was "evidence of tension"—a statement Meredith maligns as a "mischaracterization" of the record because he and D.C. were close friends. But two things can be true: people can be close friends, and there can still be tension or disagreement between them. And a rational jury could have understood the friend's testimony as the State characterizes it—reflecting tension of unknown origin between the teenage boys. In any event, the supreme court has previously confronted the precise argument advanced by Meredith and rejected it in the context of the mens rea required for first-degree murder:

> Finally [the] defendant points out no motive was ever established by the State. He somehow thinks the senselessness of the murders should in some way detract from a showing of premeditation and deliberation. Murder is always senseless. It is absurd to suggest a motive is required in order to show premeditation and deliberation.

*State v. Fryer*, 226 N.W.2d 36, 41 (Iowa 1975). We reject Meredith's argument in this case for similar reasons, and we affirm his second-degree murder conviction.

### C. Juvenile Sentencing

Meredith's last challenge seeks relief from the mandatory minimum ten-year term of incarceration imposed by the district court. We review for an abuse of discretion, which in this context means, "if the court follows [the] outlined sentencing procedure by conducting an individualized hearing, applies the [constitutional juvenile-sentencing] factors, and imposes a sentence authorized by statute and supported by the evidence, then we affirm the sentence." *State v. Majors*, 940 N.W.2d 372, 387 (Iowa 2020).

Before the sentencing hearing, separate expert witnesses for the State (Dr. Randy Otto) and Meredith (Dr. Luis Rosell) spoke with Meredith and filed reports addressing the constitutional juvenile-sentencing factors. *See generally State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014) (setting forth the factors). The court considered these reports, arguments by counsel, the presentence investigation report (PSI), and a victim impact statement from D.C.'s grandmother before announcing its reasons for sentence and imposing a ten-year mandatory minimum—somewhat less than the fifteen years requested by the State. On appeal, Meredith raises legal challenges concerning each of the five constitutionally required juvenile-sentencing factors, so we address each in turn and quote the sentencing court's rationale to give the full context.

First, the sentencing court considered "the age of the offender and the features of youthful behavior, such as immaturity, impetuosity and failure to

appreciate risks and consequences." *See id.* The court found there was limited

or no mitigating weight to this factor:

> Mr. Meredith, there is no evidence that you have any type of emotional impairment or cognitive impairment that limited your ability to appreciate the risks and consequences of your actions that night. While yes, you were under [eighteen], you were not delayed or limited in your functioning. You do not have any diagnoses that indicate any advanced immaturity or impetuosity.
> By all accounts, you were a developed, fully functioning [seventeen]-year-old that lacked any significant development impairments that would have contributed to the events of that evening.

Meredith asserts the district court had to consider this factor "in mitigating light."

But the supreme court disagrees. *See Majors*, 940 N.W.2d at 383–84 (affirming a

mandatory-minimum and rejecting a challenge to the sentencing court's statement

the juvenile defendant was "not appreciably less mature" than an adult offender

and that "[i]t does not appear to the court that the defendant's age is a mitigating

factor"). To the extent *Majors* is not dispositive on its own, we also decline

Meredith's invitation to second-guess the district court's weighing of psychologists'

reports in deciding this question, as that court was in the best position to resolve

conflicts in the evidence or decide a battle of experts.

Next, the court considered "the particular 'family and home environment'

that surround a youth." *See Lyle*, 854 N.W.2d at 404 n.10 (citation omitted). It

observed:

> The evidence before the Court from both evaluations is that your childhood did contain some adverse experiences. You had little contact with your father. You and your family were displaced by a fire a few months prior to your arrest, and at times you did lack close supervision. However, you grew up in this community. You lived here your entire life. You did have some family support.
> Even considering your adverse experiences, you obviously had some supervision, some stability, as evidenced by your lack of

contact with the juvenile and criminal justice systems prior to this incident.

Meredith claims the court "minimized the mitigating weight of [his] home and family life." This is a self-described question of the weight to afford conflicting evidence, which we are again not inclined to second-guess. And, in any event, the supreme court has affirmed a sentencing court's similar observations about an offender's lack of criminal history or juvenile record. *See Majors*, 940 N.W.2d at 388–89.

Third, the district court considered "the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of this crime." *See Lyle*, 854 N.W.2d at 404 n.10. The court explained:

> This was a dreadful, horrendous crime that was committed solely by you. There were no other individuals around to pressure you. There was no one else around to participate in this offense. You and you alone killed [D.C.]. You and you alone pulled that trigger.
> I will not blame the victim for his actions as has been urged. There was no peer pressure. There was no coercion by others. There was no action by others that influenced what happened that night. This action and its consequences are yours alone.

Meredith complains the district court did not find this factor mitigating. But, again, the supreme court has held the court was not required to do so. *See Majors*, 940 N.W.2d at 389 (affirming where "[t]he record supports the district court's determination that the third factor is not mitigating"). To the extent Meredith complains his attorney did not intend to "blame the victim" as the court understood him to argue, we discern no abuse of discretion and frankly we read counsel's reference to this case as "schoolyard conduct" and "[t]wo teenagers . . . playing with a gun" the same way the sentencing court understood it.

Fourth, the court considered "the challenges for youthful offenders in navigating through the criminal process." *See Lyle*, 854 N.W.2d at 404 n.10. The court explained:

> There's no evidence that you had any unusual difficulties navigating through the criminal process.
> Your actions and statements following this crime show an awareness of the criminality of your conduct, specifically the hiding of the firearm, your attempts to leave the scene of the crime, your multiple stories denying your involvement in the shooting. There is nothing in the record that indicates you were unable to deal with law enforcement officers that evening. In fact, you had the presence of mind to request drug testing.
> Further, there's no evidence or argument that's been offered that you were not able to participate fully in your defense and you testified at trial in your defense. There's no indication you were not able to fully process—fully participate in the criminal process.

Meredith again claims the court was required to find this factor mitigating. And again, the supreme court's decision in *Majors* is instructive, as the court there affirmed the sentencing court's conclusion this factor was not mitigating because Majors (similar to Meredith) was an adult for trial and the months preceding. *See* 940 N.W.2d at 389–90.

Last, the sentencing court considered "the possibility of rehabilitation and the capacity for change." *See Lyle*, 854 N.W.2d at 404 n.10. The court explained:

> This factor is the factor that weighs most heavily in your favor. The goal in a sentencing such as this is to craft punishment that serves both the best interest of society and the best interests of the juvenile. Rehabilitating you, so that you can be a productive member of society, serves both of these interests. You have no history of prior involvement with the juvenile and criminal justice systems.
> Your evaluations, particularly by Dr. Otto, did not reveal any callous or unemotional traits; you do not possess any anti-social attitudes; you are able to make emotional connections with others. Your educational achievements today, the fact that you completed high school, shows that you have intellectual abilities, you can accomplish tasks, you do have potential.

> The Court is concerned, however, with your lack of accountability with this offense. The Court completely disagrees with the evaluation by Dr. Rosell in this element.[2] While it is true you admit you pulled the trigger, you have continuously denied full accountability for your actions. You have blamed your drug use, you've claimed the incident was an accident, today you blame the behavior of the victim.
>
> The Court is further concerned about whether or not you will have an appropriate support system around yourself. If you truly wish to succeed, if you truly wish to be rehabilitated, you need to not only work on yourself, but also surround yourself with the right people who can provide support when you need it the most.

Meredith takes umbrage at the district court's comments on his lack of remorse and failure to accept responsibility for the crime. But it is well-established these are proper sentencing considerations. *See State v. West Vangen*, 975 N.W.2d 344, 355 (Iowa 2022) (observing remorse and accepting responsibility are steps toward rehabilitation); *State v. Knight*, 701 N.W.2d 83, 87 (Iowa 2005) (similar). And we agree with the district court that Meredith's statements fell short of accepting responsibility for voluntarily shooting D.C. with malice, as found by the jury. Meredith also asserts the reference to "blam[ing] the behavior of the victim" was not appropriate, but again we find the court's comments appropriately responsive to Meredith's trial testimony and defense arguments regarding "schoolyard conduct" and "[t]wo teenagers . . . playing with a gun." We see no error in the sentencing court's analysis of the fifth factor.

Because the sentencing "court follow[ed] our outlined sentencing procedure by conducting an individualized hearing, applie[d] the [constitutional juvenile-

---

[2] Earlier in the sentencing proceeding, the assistant attorney general flagged errors in Rosell's report, including his claim that Meredith pled guilty when in fact he pled not guilty and was convicted following trial by jury.

sentencing] factors, and impose[d] a sentence authorized by statute and supported by the evidence," we affirm.  *See Majors*, 940 N.W.2d at 387.

**AFFIRMED.**